702 A.2d 1311

GEORGE F. WHALEN, JR., PLAINTIFF–RESPONDENT/CROSS–
APPELLANT, v. SCHOOR, DEPALMA & CANGER GROUP, INC.,
DEFENDANT–APPELLANT/CROSS–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued October 22, 1997—Decided November 19, 1997.

Before Judges BAIME, WEFING and BRAITHWAITE.

*Timothy D. Lyons* argued the cause for appellant/cross-respondent (*Giordano, Halleran & Ciesla*, attorneys; *Michael J. Canning*, of counsel and on the brief; *Mr. Lyons*, on the brief).

*Bernard V. Kelly* argued the cause for respondent/cross–appellant.

The opinion of the court was delivered by

BAIME, J.A.D.

This appeal and cross-appeal concern the enforceability of an amendment to a shareholder redemption agreement delaying the valuation date of redeemed stock until the completion of criminal proceedings pending against the corporation and its principal officer. Plaintiff, a former employee and minority shareholder of defendant Schoor, DePalma and Canger Group, Inc. (Schoor), brought suit for breach of the original redemption agreement,

claiming that the amendment violated public policy. The Law Division granted summary judgment, finding that the amendment was unenforceable because it was signed under duress. Schoor appeals from the summary judgment. Plaintiff cross-appeals from the denial of counsel fees. We hold that the amendment did not violate public policy.

## I.

Plaintiff commenced his employment with Schoor in 1984. In 1988, Schoor offered to make plaintiff a shareholder. Plaintiff accepted the promotion and executed the company's shareholder redemption agreement. In accordance with the terms of the agreement, plaintiff signed a promissory note in the principal amount of $30,256 in consideration for his purchase of 400 shares of company stock. The note required plaintiff to pay Schoor the principal on a yearly installment basis with payments subject to accumulating interest at the prime rate. Plaintiff ultimately reduced the principal amount due on the note to $22,692.

In 1989, Schoor reorganized its internal structure and adopted an employee stock ownership plan. The plan amended the shareholder redemption agreement by providing that stock held over five years would be valued at three times the adjusted book value, while stock held for a lesser period would be valued at the adjusted book value. It is undisputed that plaintiff voluntarily signed this amendment.

In April 1990, Schoor and its principal officer, Stephen P. DePalma, were indicted. The board of directors temporarily removed DePalma from participation in the company's operations. In addition, DePalma's stock was placed in a blind trust. Concerned that the indictment would have a depressing effect on the company's profitability, the board proposed to again amend the shareholder redemption agreement.

The articulated objective of the amendment was to dissuade shareholders from immediately exercising their redemption rights. The purpose was to assure unity among shareholders so that no

one could "make a quick profit" while the remaining owners were left to deal with the financial perils generated by a depressed real estate market and the pending indictment. This objective was to be achieved by delaying the valuation date for redeemed stock until after disposition of the criminal charges. Stripped to its essentials, the amendment provided that the redeemed stock would be valued at least twelve months after disposition of the indictment by dismissal, plea or trial verdict.

According to plaintiff's certification, the proposed amendment was given to each shareholder with the direction that it be signed the same day. However, the record discloses that the proposed amendment was accompanied by an explanatory memorandum prepared by Schoor's general counsel summarizing the changes in the shareholders' redemption rights. As described in the memorandum, the amendment provided a "two prong[ed] test" to determine the applicable valuation date. The memorandum explained that under the original redemption agreement, the date for determining the value of redeemed stock was "the last day of the first quarter immediately preceding the [s]hareholder's departure[, *i.e.*, February 28, 1990, if the shareholder left on June 1, 1990]." According to the memorandum, the amendment provided an alternate date for valuation—"between the 12th and 24th month after the day on which the [c]riminal [p]roceedings [were] resolved...." As explained in the memorandum, "the valuation used to price the stock [would] be the one that [was] the lowest of the two dates." The memorandum is dated June 26, 1990. Plaintiff executed the amended shareholder redemption agreement on July 12, 1990.

On November 15, 1991, plaintiff's employment was terminated, thus triggering his right to have the company redeem his shares. Under the formula contained in the original redemption agreement, the last day of the most recently completed first quarter of Schoor's fiscal year which preceded the termination date was February 28, 1991. Following his termination, Schoor provided plaintiff with an accounting statement, calculating the value of his redeemed stock utilizing a promissory note in the principal

amount of $22,171.29. This amount reflected the adjusted book value of plaintiff's shares, calculated as of February 28, 1991, with a set-off of the outstanding principal and interest Whalen owed from his original purchase of the stock. The note specified that it was subject to an adjustment and replacement pursuant to the alternate valuation formula provided in the amendment to the redemption agreement.

The charges against the corporation were dismissed following its enrollment in a pretrial intervention program. On October 9, 1991, a jury acquitted DePalma. Under the formula provided in the amendment to the redemption agreement, the alternate date for the valuation of plaintiff's redeemed stock was February 28, 1993. The aggregate adjusted book value of plaintiff's shares on that date was $18,724. Schoor claimed that it was entitled to a refund of payments it had made to the plaintiff.

The parties filed cross-motions for summary judgment. The Law Division issued a letter opinion granting plaintiff's motion and denying the cross-motion. The judge found that the amendment to the redemption agreement violated public policy. In reaching this conclusion, the judge reasoned that, as a minority shareholder, plaintiff was not in a position to object to the changes provided in the amendment. The judge concluded that the amendment constituted a contract of adhesion and was unenforceable. However, plaintiff's motion for counsel fees was denied.

## II.

■ We commence our analysis with the settled principle that parties bargaining at arm's-length may generally contract as they wish. *Marchak v. Claridge Commons, Inc.,* 134 *N.J.* 275, 281–82, 633 *A.2d* 531 (1993); *Terminal Constr. Corp. v. Bergen County Hackensack River Sanitary Sewer Dist. Auth.,* 34 *N.J.Super.* 478, 504, 112 *A.2d* 762 (App.Div.1954), *modified on other grounds,* 18 *N.J.* 294, 113 *A.2d* 787 (1955). Within the framework of modern commercial life, "the basic tenet of freedom ... of contract is a factor of importance." *Henningsen v. Bloomfield Motors, Inc.,* 32

N.J. 358, 386, 161 A.2d 69 (1960). The courts "should [generally] enforce contracts as made by the parties." *Vasquez v. Glassboro Service Ass'n, Inc.*, 83 N.J. 86, 101, 415 A.2d 1156 (1980).

Several exceptions to this rule have evolved over the years. We have historically refused to enforce contracts that violate public policy and those that are the product of economic oppression. These exceptions often go hand-in-hand, but their theoretical underpinnings are separate and distinct. In a variety of legal settings, we have declined to enforce contracts that violated statutes, promoted crime, interfered with the administration of justice, encouraged divorce, destroyed privacy rights, or restrained trade. *Id.* at 99, 415 A.2d 1156; *see also Karlin v. Weinberg*, 77 N.J. 408, 390 A.2d 1161 (1978); *Whitmyer Bros., Inc. v. Doyle*, 58 N.J. 25, 274 A.2d 577 (1971); *Solari Industries, Inc. v. Malady*, 55 N.J. 571, 264 A.2d 53 (1970); *Staedler v. Staedler*, 6 N.J. 380, 78 A.2d 896 (1951); *Melletz v. Melletz*, 271 N.J.Super. 359, 638 A.2d 898 (App.Div.), *certif. denied*, 137 N.J. 307, 645 A.2d 136 (1994); *Pugh v. Pugh*, 216 N.J.Super. 421, 524 A.2d 410 (App.Div.1987); *Driscoll v. Burlington–Bristol Bridge Co.*, 10 N.J.Super. 545, 77 A.2d 255 (Ch.Div.1950), *modified on other grounds*, 8 N.J. 433, 86 A.2d 201, *cert. denied*, 344 U.S. 838, 73 S.Ct. 25, 97 L.Ed. 652 (1952). We have taken this course because, whether or not grounded in the consent of the immediate parties, "no contract can be sustained if it is inconsistent with the public interest or detrimental to the common good." *Vasquez v. Glassboro Service Ass'n, Inc.*, 83 N.J. at 98, 415 A.2d 1156. In a separate but related series of decisions, our courts have invalidated otherwise enforceable contracts because of economic oppression or duress. *See Rudbart v. Water Supply Comm'n*, 127 N.J. 344, 605 A.2d 681, *cert. denied*, 506 U.S. 871, 113 S.Ct. 203, 121 L.Ed.2d 145 (1992); *Continental Bank of Pa. v. Barclay Riding Acad.*, 93 N.J. 153, 459 A.2d 1163, *cert. denied*, 464 U.S. 994, 104 S.Ct. 488, 78 L.Ed.2d 684 (1983); *Shell Oil Co. v. Marinello*, 63 N.J. 402, 307 A.2d 598 (1973), *cert. denied*, 415 U.S. 920, 94 S.Ct. 1421, 39 L.Ed.2d 475 (1974) (superseded by statute on other grounds as recognized by *Graeber v. Mobil Oil Corp.*, 614 F.Supp. 268 (D.N.J.

1985)); *Ellsworth Dobbs, Inc. v. Johnson*, 50 *N.J.* 528, 236 *A.*2d 843 (1967). Many of these decisions have involved unlawful acts or threats that have deprived the assenting party of his unfettered will. *Continental Bank of Pa. v. Barclay Riding Acad.*, 93 *N.J.* at 177, 459 *A.*2d 1163; *S.S. & O. Corp. v. Bernards Sewerage Auth.*, 62 *N.J.* 369, 386–87, 301 *A.*2d 738 (1973); *West Park Ave., Inc. v. Ocean Tp.*, 48 *N.J.* 122, 129–30, 224 *A.*2d 1 (1966); *Ross Sys. v. Linden Dari–Delite, Inc.*, 35 *N.J.* 329, 335, 173 *A.*2d 258 (1961). Others have concerned contracts of adhesion where the parties "lack[ed] equality in [their] respective bargaining positions." *Shell Oil Co. v. Marinello*, 63 *N.J.* at 408, 307 *A.*2d 598; *see also Vasquez v. Glassboro Service Ass'n, Inc.*, 83 *N.J.* at 103, 415 *A.*2d 1156. In determining whether to enforce the terms of these contracts, "courts have looked not only to the take-it-or-leave-it nature of the standardized form of the document but also to the subject matter of the contract, the parties' relative bargaining positions, the degree of economic compulsion motivating the 'adhering' party, and the public interests affected by the contract." *Rudbart v. Water Supply Comm'n*, 127 *N.J.* at 356, 605 *A.*2d 681.

Against this backdrop, we first find no identifiable public policy barring enforcement of the amendment to the shareholder redemption agreement. We, of course, recognize that "[p]ublic policy eludes precise definition and may have diverse meanings in different contexts." *Vasquez v. Glassboro Service Ass'n, Inc.*, 83 *N.J.* at 98, 415 *A.*2d 1156. The sources of public policy include "federal and state legislation and judicial decisions." *Ibid.* Within this analytical framework, we perceive nothing in the alternate valuation date set forth in the amendment that "ha[d] a tendency to be injurious to the public or [detrimental to] the public good. . . ." *Driscoll v. Burlington–Bristol Bridge Co.*, 10 *N.J.Super.* at 574, 77 *A.*2d 255 (quoting *Girard Trust Co. v. Schmitz*, 129 *N.J.Eq.* 444, 20 *A.*2d 21 (Ch.1941)); *compare Young v. Prudential Ins. Co.*, 297 *N.J.Super.* 605, 620–21, 688 *A.*2d 1069 (App.Div.), *certif. denied*, 149 *N.J.* 408, 694 *A.*2d 193 (1997), *and Allgor v. Travelers Ins. Co.*, 280 *N.J.Super.* 254, 260, 654 *A.*2d 1375 (App.

Div.1995), *with Leonard & Butler, P.C. v. Harris,* 279 *N.J.Super.* 659, 667–68, 653 *A.*2d 1193 (App.Div.), *certif. denied,* 141 *N.J.* 98, 660 *A.*2d 1196 (1995); *Saxon Const. v. Masterclean,* 273 *N.J.Super.* 231, 236–37, 641 *A.*2d 1056 (App.Div.), *certif. denied,* 137 *N.J.* 314, 645 *A.*2d 142 (1994). The amendment concerned only the private rights of the shareholders and had no impact on the public at large. *See McBride v. Minstar, Inc.,* 283 *N.J.Super.* 471, 491, 662 *A.*2d 592 (Law Div.1994), *aff'd,* 283 *N.J.Super.* 422, 662 *A.*2d 567 (App.Div.), *certif. denied,* 143 *N.J.* 319, 670 *A.*2d 1061 (1995).

In the context of the private rights involved, the amendment did not affect the interests of minority shareholders to any greater extent than it impacted upon the interests of majority shareholders. Each class of shareholder stood to gain or lose equally under the alternate valuation date contained in the amendment. This is not a case where "the directors or those in control have acted ... oppressively or unfairly toward one or more minority shareholders...." *N.J.S.A.* 14A:12–7(1)(c). Moreover, it does not involve conduct that "frustrate[s] a shareholder's reasonable expectations." *Brenner v. Berkowitz,* 134 *N.J.* 488, 506, 634 *A.*2d 1019 (1993). Instead, the amendment was designed to serve a legitimate business objective—to secure unity among shareholders and prevent hemorrhaging of the company's capital.

■ We also find no support for the Law Division's conclusion that plaintiff signed the amendment under duress. This is not a case in which one of the contracting parties enjoys "overwhelming economic power," *Gilmer v. Interstate/Johnson Lane Corp.,* 500 *U.S.* 20, 33, 111 *S.Ct.* 1647, 1656, 114 *L.Ed.*2d 26, 41 (1991), and uses its dominance to exert wrongful pressure on the other. As we pointed out, the amendment proposed by the board of directors was grounded in a sound business purpose and was designed to advance the interests of the corporation and its shareholders. We do not denigrate plaintiff's claim that he signed the agreement because he feared losing his job and was concerned that he would not be considered a "team player" if he refused. It is undisputed, however, that no one threatened to discharge plaintiff unless he

signed the amendment. In any event, plaintiff was not "compelled to make a disproportionate exchange of values or to give up something for nothing." *Continental Bank of Pa. v. Barclay Riding Acad.*, 93 *N.J.* at 176, 459 *A.*2d 1163 (quoting 13 *Williston on Contracts* § 1617 at 704 (3d ed.1970)). Instead, plaintiff was asked to share the financial risk confronting the company—a burden that all of the shareholders ultimately agreed to bear.

Schoor's shareholders were undoubtedly faced with several unpalatable choices by reason of the indictment. But we would be short on realism were we to ignore the fact that the business world is replete with situations requiring the making of difficult judgments. The pressures that come to bear may spring from a variety of sources—social, familial, and professional. That such pressures may lead to a decision that is later regretted cannot be the basis for eradicating the choice thus made. Here, plaintiff was faced with a dilemma requiring him to choose between making an assured profit or joining the other shareholders in their attempt to preserve the financial integrity of the company. Plaintiff's conclusory allegation of undue pressure was far too flimsy to warrant a grant of summary judgment.

In light of our disposition of the principal appeal, we do not address the issues raised in the cross-appeal. Consequently, the judgment is reversed, and the matter is remanded to the Law Division for further proceedings.