822 A.2d 663 (2003)
360 N.J. Super. 292
John VARSOLONA, Ruth J. Fails, Garrett E. Reed, Jr., and Gwendolyn C. Reed, suing individually and on behalf of all others similarly situated, Plaintiffs-Respondents,
v.
BREEN CAPITAL SERVICES CORP., Bankers Trust Company, and GTL Investments L.P., Defendants-Appellants,
and
FBTLC Trust II,[1] Defendant.
Louise Garretson, suing individually and on behalf of all other similarly situated Plaintiffs, Plaintiff-Respondent,
v.
CSFBTLC Trust II, Bankers Trust Company and Breen Capital Services Corp., Defendants-Appellants.
Superior Court of New Jersey, Appellate Division.
Argued May 6, 2003.
Decided May 21, 2003.
*664 Kevin McNulty argued the cause for appellant Bankers Trust Company (Gibbons, Del Deo, Dolan, Griffinger & Vecchione, attorneys; Mr. McNulty, on the brief, Newark; Frederick A. Brodie and F. Joseph Owens, Jr. (Pillsbury Winthrop) of the New York bar, admitted pro hac vice, on the brief, New York City).
Stacy L. Moore, Jr., argued the cause for appellants Breen Capital Services Corporation and GTL Investments (Parker, McCay & Criscuolo, attorneys; Mr. Moore, on the brief, Marlton; Carl D. Poplar (Poplar & Eastlack), Turnersville, Paul E. Summit and Andrew T. Solomon, Dix Hills, NY (Sullivan & Worcester) of the New York bar, admitted pro hac vice, New York City, of counsel).
Gary F. Eisenberg, New Brunswick, argued the cause for appellant CSFBTLC Trust II (Windels, Marx, Lane & Mittendorf, attorneys; Mr. Eisenberg, on the brief).
Peter S. Pearlman, argued the cause for respondents (Cohn, Lifland, Pearlman, *665 Herrmann & Knopf, attorneys; Mr. Pearlman, Jeffrey W. Herrmann, Saddle Brook, Russell S. Burnside, Newark and Lawrence S. Klitzman, of counsel; Mr. Herrmann, Mr. Brunside, Mr. Klitzman and Jessica V. Henry, Morristown, on the brief).
Cooper, Perskie, April, Niedelman, Wagenheim & Levenson, Atlantic City, and Donald R. Dinan (Hall, Estill, Hardwick, Gable, Golden & Nelson) of the Washington, D.C. bar, admitted pro hac vice, attorneys for amicus curiae The National Tax Lien Association (Michael Gross and Mr. Dinan, on the brief).
Gilmore & Monahan, Toms River, for amicus curiae The Tax Collectors and Treasurers Association of New Jersey (Michael J. Gilmore, on the brief).
Before Judges COBURN, COLLESTER and ALLEY.
The opinion of the court was delivered by COBURN, J.A.D.

IBACKGROUND
The privatization of real estate tax collection, sometimes called "tax farming," is an ancient practice, apparently first engaged in by the Ptolemaic Egyptians, and then by the ancient Greeks, the Roman Empire, and Italy and England beginning in the Middle Ages. Frank S. Alexander, Tax Liens, Tax Sales, and Due Process, 75 Ind. L.J. 747, 758-60 (Summer 2000). It is practiced today by most jurisdictions in the United States. Id. at 760.
Jersey City was the first municipality in the country to introduce into tax farming the large scale securitization of real estate tax sale certificates ("TSCs"). Georgette C. Poindexter, Lizabethann Rogovoy & Susan Wachter, Selling Municipal Tax Receivables: Economics, Privatization, and Public Policy in an Era of Urban Distress, 30 Conn. L.Rev. 157, 172, 185-86 (Fall 1997). Securitization involves the bundling and sale of TSCs to a trust. The trust raises the necessary funds by issuing bonds or notes, secured by the TSCs, to an institutional investor, which in turn sells those securities to the public. The municipality usually receives about seventy percent in cash and the balance in a note subordinated to the securities. The trust contracts with an entity called a servicer, which pursues collection of the TSC and, if necessary, foreclosure. Id. at 173-87. Jersey City has used this process twice: in 1993 it sold about 2500 TSCs to a trust for about $44 million, and in 1994 it sold about 1200 TSCs to a trust for about $14 million. Other jurisdictions have adopted the practice, including "New Haven ($23 million, 1995), Fulton County/City of Atlanta ($30 million, 1995), New York City ($250 million, 1996), Washington, D.C. ($50 million, 1996), Philadelphia ($106 million, 1997), Puerto Rico ($400 million, 1998), and hundreds of other local governments are actively considering such sales." Alexander, supra, 75 Ind. L.J. at 761 (footnotes omitted).
The litigation under review arose as a result of Jersey City's program, and concerns both the 1993 and 1994 sales, which were conducted pursuant to the tax sale law, N.J.S.A. 54:5-1 to -137 (the "Act"), and expressly permitted by it, N.J.S.A. 54:5-113, 113.1 and 114.1. The challenge in this case is not to the sales. Rather, it is to one of the collection methods employed by the servicers under the Jersey City plan; namely, the use of private installment payment plans ("IPPs"). An IPP is a written agreement between the servicer and the property owner that permits avoidance of foreclosure by monthly payments calculated to amortize the *666 debt created by the TSC, usually within three years.

IIPROCEDURAL SETTING
The complaints, certified as class actions pursuant to Rule 4:32-2(a), were brought on behalf of commercial and private property owners who had entered into IPPs with the servicers, defendants Breen Capital Services Corp. ("Breen"), and Bankers Trust Company ("BT"). The complaints demanded damages under N.J.S.A. 54:5-63.1, a trebling of those damages and counsel fees under the Consumer Fraud Act, N.J.S.A. 56:8-1 to -109, and forfeiture of the TSCs owned by defendants FBTLC Trust II, CSFBTLC Trust II, and GTL Investments L.P. ("GTL"). Following the exchange of discovery, both sides moved for summary judgment. The trial court denied defendants' motions, and granted plaintiffs' motions. The judgments, which included relief under the Consumer Fraud Act, required BT and Breen to pay trebled damages of over $26 million in Varsolona, over $5 million in the Garretson cases, and required GTL and Breen to pay trebled damages of over $4 million in Varsolona. The judgments also declared forfeiture of the TSCs. Other matters were reserved for later decision, including the amount of counsel fees to be awarded under the Consumer Fraud Act. Defendants filed notices of appeal and motions for leave to appeal, which we granted. We hereby consolidate all appeals for purposes of this opinion.

IIIDISPOSITIVE ISSUE
Although many matters have been briefed, the dispositive issue is whether private installment payment plan agreements in general and the IPPs offered in these cases in particular, violate the tax sale law. The trial court recognized that the Act neither expressly prohibits nor expressly permits private IPPs. Rejecting defendants' claim that absent an express statutory prohibition, their common law right to freedom of contract should be respected, the trial court held the IPPs illegal. It reached that result because of the Act's lack of express authorization for IPPs, because it believed that they were inconsistent with the Act's design and purposes, and because these IPPs contained some terms that were different from, and in some cases more onerous than, those stated in the Act. Since we are satisfied these voluntary agreements are neither illegal under the Act, nor violative of public policy, we reverse and remand for entry of judgments dismissing the complaints with prejudice.

IVFACTS
By 1992, Jersey City had developed severe financial problems, due primarily to a large backlog of delinquent real estate taxes. In 1993, the backlog and resulting financial crisis were solved by the introduction of the tax lien financing program which gave rise to this litigation. When the first sale was completed, Jersey City had converted a large portion of its unproductive portfolio of TSCs into a note for $19 million, bearing interest at twenty-eight percent, and $25 million in cash. As a result of the second sale, in 1994, Jersey City raised about $14 million, part in cash and the rest in a note.
The structure of the financing arrangements necessary to complete the TSC sales and put the full program into operation is complex. However, we will not burden this opinion with a detailed description of that structure since the focus of this case is limited to the legality of the IPPs offered by the servicers.
BT is the master servicer for the trusts, and is responsible to them and to Jersey City for collection of the tax liens purchased *667 by the trusts. In general it was obliged to maintain accurate records while enforcing the liens, including those relating to property owners who chose to enter IPPs. The master service agreement, which was approved by Jersey City, contains this statement respecting the IPPs:
Section 7.03. Installment Payment Plans. The Master Servicer is hereby authorized to enter into installment payment plans relating to the redemption of Tax Liens with Property Owners and may negotiate the individual terms and conditions of such installment payment plans in its sole discretion so as to maximize the amount reasonably recoverable in respect of the Tax Liens, provided that (a) the total aggregate amount due and payable by the Property Owner pursuant to such payment plan shall be no less than the Tax Lien Balance of such Tax Lien calculated through and including the next succeeding Payment Date after the date upon which the final payment under such payment plan has been received, (b) the Property Owner has agreed to make all payments pursuant to such payment plan to the Master Servicer rather than the City Collector and the Master Servicer agrees to hold the funds resulting from such payments in an Eligible Account or Accounts located at the Master Servicer (or at another institution at which an Eligible Account may be held if the Master Servicer shall become ineligible to hold such an account) and to deliver such funds to the City Collector upon the payment in full by the Property Owner of all amounts required thereunder to permit redemption of such Tax Liens, and (c) such payment plan is evidenced by a written agreement executed by each of the Master Servicer and the Property Owner, a copy of which shall be delivered to the Trustee promptly after its execution.
The program required BT to delegate most of its servicing duties to Breen, a company with special expertise in administering and liquidating TSCs. Jersey City wanted the IPPs to be made available to the public to limit foreclosures, and Breen undertook that function for BT and for defendant GTL, a company which also invested in TSCs.
No property owner was required to agree to an IPP; it was an option offered to tax delinquents who wanted to avoid the otherwise justified institution of foreclosure proceedings. Redemption under the Act was the other option, and that could be done by the property owner at any time before foreclosure and whether or not an IPP had been agreed to.
In 1993, about 2500 TSCs were sold under the program, and 434 property owners entered into IPPs with Breen; in 1994, there were about 1200 TSCs sold, and 132 property owners opted for IPPs. The typical IPP provided as follows:
I hereby agree to redeem that Tax Sale Certificate in the following manner:
I promise to pay to Bankers Trust Co., as Collateral Agent, c/o Breen Capital Services Corp., ... the sum of ... less any Down Payment Amount to be paid with interest thereon at the rate of 18% per annum from the date hereof payable in ... equal monthly installments of ... commencing on ... until such balance is paid in full, in addition to all costs and expenses, if any (including reasonable counsel fees and expenses), incurred by the Agent in connection with the enforcement of this Agreement. Prepayment will not carry a penalty.
If I fail to make any installment payment when due, I will be in default. If I fail to make the payment necessary to cure a default within ten (10) days after written notice, I understand and acknowledge that the whole amount due to *668 redeem the Tax Sale Certificate shall become immediately due and payable together with interest at the rate of 18% per annum.
....
THIS AGREEMENT DOES NOT CONSTITUTE A WAIVER OF THE RIGHT TO FORECLOSE THE TAX SALE CERTIFICATE DESCRIBED HEREIN. IN THE EVENT THIS AGREEMENT IS NOT FULLY PERFORMED AND I AM IN DEFAULT, BANKERS TRUST OR ITS ASSIGNEE WILL BE ENTITLED TO ANY ONE OR MORE OF THE FOLLOWING FORMS OF RELIEF: FORECLOSURE OF THE TAX SALE CERTIFICATE, A CLAIM UNDER THIS AGREEMENT OR ANY OTHER PROCEEDING PERMITTED BY LAW.
During the term of this agreement, I agree to pay any and all property taxes, water and sewer charges and other municipal charges and assessments imposed on the property on or before the due dates thereof, and such payments are in addition to the monthly installment payments due as above provided. My failure to pay such property taxes or water and sewer charges or municipal charges when due shall be deemed a default under this agreement.
In its partial summary judgment order of February 10, 2000, the trial court identified the following financial aspects of the IPPs as violative of the Act:
(a) entering into installment payment agreements is a violation of N.J.S.A. 54:5-55;
(b) exacting compound interest by charging interest on any amount other than the face amount of the certificate of assignment (the assignment amount) is a violation of N.J.S.A. 54:5-60;
(c) calculating per diem interest based on a 360 day year and multiplying the per diem rate by 365 days for a full year is a violation of N.J.S.A. 54:5-60;
(d) charging redemption fees: (i) in advance of redemption; (ii) with respect to payments not made to the municipal tax collector; and (iii) without filing affidavits with the tax collector is a violation of N.J.S.A. 54:5-55, N.J.S.A. 54:5-61 and N.J.S.A. 54:5-62;
(e) charging fees not provided by statute, including but not limited to bad check fees is a violation of N.J.S.A. 54:5-61; and
(f) charging any fee without filing affidavits with the tax collector is a violation of N.J.S.A. 54:5-61 and N.J.S.A. 54:5-62.
Defendants note that before plaintiffs sued, they dropped some of the practices identified by the court. For example, charging compound interest and exacting the $25 charge for dishonored checks. However, that is of no moment since defendants also claim that all of the practices criticized by the trial court are legal, in which event they could include them in agreements with property owners who enter into IPPs in the future either in Jersey City or in other municipalities choosing to engage in this form of tax farming.
The IPPs were negotiable, and some property owners employed attorneys to help them gain more preferable terms. Most agreements provided for a down payment and monthly payments for thirty-six months. During that period, the property owner could still redeem through the tax collector, and seventy-six followed that course. Sometimes the tax collector would contact Breen to find out how much the property owner owed, and sometimes the tax collector would require the entire amount due on redemption. When that occurred, Breen, after receiving the funds from the tax collector, would refund to the *669 property owner all payments previously made under the IPP. At the end of the period, assuming all payments had been made to defendants, the TSC would be canceled of record. More than eighty percent of the class members completed their IPP payments, another thirteen percent, or so, redeemed through the tax collector, and the remaining seven percent appear to have lost their properties in foreclosure after failing to abide by the terms of their IPPs.
In short, in consideration for the withholding of foreclosure proceedings, which defendants had a right to pursue, each plaintiff agreed to be personally liable for the debt created by the IPP, and agreed to payment terms that differed from the Act. Defendants benefitted by obtaining a stream of income from the TSCs, and by avoiding the delay, expense, and risk involved in prosecuting a foreclosure proceeding and then selling the property. Plaintiffs benefitted by being able to pay off TSCs in installments without having to come up with a single lump sum payment, while retaining the right to redeem by a lump sum payment to either the servicer or the tax collector if funds became available; by avoiding the costs of defending against a foreclosure proceeding; and ultimately by avoiding loss of their property by foreclosure.

VTHE TRIAL COURT'S OPINION
This case is based on the claim that the IPPs violated the Act and the policies implicit therein. However, as recognized by plaintiffs and the trial court, the Act contains no express provision against private installment payment plan agreements between a property owner and a TSC holder.

Lacking direct legislative support for their position, plaintiffs rely on the trial court's reasoning, which began with the observation that when a municipality holds a tax lien, the Act provides detailed rules governing installment payment agreements offered to the delinquent taxpayer. N.J.S.A. 54:5-65 to -75. The trial court inferred that those sections demonstrate a legislative policy that such agreements be "accessible to the public," and that they were designed "to insure the accuracy of municipal tax records," and "to provide the taxpayer and the public at large with a legally sanctioned means to officially and reliably ascertain the tax status of any real property in the State." After asserting that the viability of private installment plans depends on the "nature of the parties' relationship," the trial court referred to the proposition that the rights arising under a tax sale certificate are set by the Act, citing Brewer v. Porch, 53 N.J. 167, 173, 249 A.2d 388 (1969), and concluded that "the absence of specific authority, read in pari materia with the ... provisions of the Act[,] discloses the legislative intent not to allow private installment agreements." The trial court also found that the IPPs in question ran "counter to the legislative policy" of the Act because they circumvent "the municipal tax collector" and "frustrate the tax collector's ability to carry out ... statutorily prescribed duties." It went on to criticize the IPPs because they involve costs and fees in excess of those allowed by the Act, citing N.J.S.A. 54:5-61[2], as well as their *670 collection before redemption and without the filing of the required affidavit, citing N.J.S.A. 54:5-55[3] and N.J.S.A. 54:5-62.[4] Finally, the trial court faulted the IPPs as capable of involving what it termed improper "partial redemptions" in the following setting: a property owner signs an IPP, makes some payments and then defaults; the TSC holder files foreclosure proceedings, and the owner decides to redeem. Based on its literal reading of N.J.S.A. 54:5-54[5] and Rule 4:64-6(b)[6], *671 the trial court concluded that the owner's only remedy was to pay the tax collector, rather than the holder, with the result that the owner would have to come up with the entire amount due despite having made some payments to the holder, and would have to rely on the holder's "good faith to return the overpayment, or file a law suit to recover it."

VIANALYSIS
The right to enter into enforceable private contracts is protected as a matter of constitutional law, N.J. Const. art. IV, § 7, ¶ 3 ("The Legislature shall not pass any ... law impairing the obligation of contracts ...."), and common law, Marchak v. Claridge Commons, Inc., 134 N.J. 275, 281-82, 633 A.2d 531 (1993) (noting that parties bargaining at arm's length may generally contract as they wish); Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358, 386, 161 A.2d 69 (1960) ("the basic tenet of freedom ... of contract is a factor of importance"). However, that right has limits: courts will invalidate or modify contracts that violate a statute, offend public policy, or result from economic oppression or duress. Vasquez v. Glassboro Service Ass'n, Inc., 83 N.J. 86, 98-99, 415 A.2d 1156 (1980); Whalen v. Schoor, DePalma & Canger, 305 N.J.Super. 501, 505-07, 702 A.2d 1311 (App.Div.1997).
When the Legislature wants to limit the contractual rights of private parties under a regulatory act, its general practice has been to say so directly. See, e.g., N.J.S.A. 2A:18-61.4 (Anti-Eviction Act); N.J.S.A. 2A:18-61.36 (Senior Citizens and Disabled Protected Tenancy Act); N.J.S.A. 2A:50-2.2 (relating to mortgage foreclosures); N.J.S.A. 2A:50-61 (Fair Foreclosure Act); N.J.S.A. 17:16C-100(c) (Door-To-Door Home Repair Sales Act); N.J.S.A. 34:6A-45(d) (Worker Health and Safety Act); N.J.S.A. 43:21-15(a) (Unemployment Compensation Law); N.J.S.A. 46:8-36 (security deposit law); N.J.S.A. 46:8C-5 (mobile home park law); and N.J.S.A. 56:12-11 (Consumer Contracts).
When the Legislature has not so provided, our courts tend to uphold the private contract. In Dept. of Labor & Indus. v. Asbury Metro. Hotel Co., 80 N.J.Super. 486, 194 A.2d 244 (App.Div.1963), we put it this way:
If our Legislature wanted to preclude all voluntary assignments of wages, except those expressly permitted by statute, it could have expressly so provided.... Nor do we interpret legislative sanction given to certain voluntary and involuntary deductions from wages ... as expressive of an intent that those permissive acts prohibit all others. The Legislature has not manifested any such intent with sufficient clarity as to preclude the normal rules of statutory construction, that laws in derogation of common law rights and penal statutes are to be strictly construed.
[Id. at 493, 194 A.2d 244 (citations omitted).]
See also Allstate Ins. Co. v. Malec, 104 N.J. 1, 10-11, 514 A.2d 832 (1986), upholding the provision of an automobile policy which excluded liability coverage for intentional acts because no statute prohibited the exclusion, which was found to be consistent with public policy.
Under previous versions of the Act, our courts recognized the right of TSC holders and owners to engage in private agreements respecting the lien. Ruddy v. Inhabitants of Woodbridge Township, 47 N.J.L. 142, 142-43 (E. & A.1885); Nugent v. De Raismes, 93 N.J. Eq. 632, 634, 117 A. 630 (E. & A.1922). That is *672 significant since we are obliged to assume that "the Legislature is thoroughly conversant with its own legislation and the judicial construction of its statutes." Brewer, supra, 53 N.J. at 174, 249 A.2d 388 (citations omitted). Given that principle, one would suppose that if the Legislature had wanted to entirely outlaw private contracts under the Act, which was adopted in 1918, L. 1918, c. 237, it would have said so. And yet it did not, and it has not done so since that date, although it has amended the Act from time to time while courts continued to enforce private agreements involving TSCs. See, e.g., Margolis v. Interboro Holding Corp., 125 N.J.L. 614, 615, 18 A.2d 23 (Sup.Ct.1941); and Dintenfass v. Willat Film Corp. 108 N.J. Eq. 195, 196-98, 154 A. 546 (Ch.1931).
Although this might seem sufficient reason for reversal of the judgment, on occasion we have rejected private agreements even though they were not expressly prohibited by the regulatory statute. For example, in Sacks Realty Co., Inc. v. Shore, 317 N.J.Super. 258, 721 A.2d 1011 (App.Div.1998), we refused to enforce an agreement as a matter of public policy because to do otherwise would "substantially undermine the Legislative effort over the years to protect tenants from the hardships of [condominium and cooperative] conversion[s]." Id. at 270, 721 A.2d 1011. Thus, we must consider whether the trial court was correct in believing that IPPs substantially interfere with the Act, even though they are not expressly forbidden by it.
The trial court first considered the provisions of the Act authorizing redemption by installment payments with respect to tax liens held by a municipality, apparently inferring that private installment plans would substantially interfere with the goals of this portion of the Act. These provisions were not included in the 1918 law. Indeed, fourteen years passed before the Legislature decided to grant municipalities holding tax liens the power to accept installment payments of back taxes from delinquent property owners. N.J.S.A. 54:5-65 to -75, as amended by L. 1932, c. 195.
Although we interpret legislative delegations of authority to municipalities broadly, Fanelli v. City of Trenton, 135 N.J. 582, 591, 641 A.2d 541 (1994), considering both the express terms and their implications, Paruszewski v. Township of Elsinboro, 154 N.J. 45, 52, 711 A.2d 273 (1998), under the New Jersey Constitution powers that are not expressly given to a municipality must not go beyond "those of necessary or fair implication, or incident to the powers expressly conferred, or essential thereto, and not inconsistent with or prohibited by this Constitution or by law," N.J. Const. Art. IV, § 7, ¶11. Since prior to 1932, the only power given to a lien-holding municipality was to accept payment in full, it is hardly surprising that legislation was thought necessary to introduce and regulate redemption by installment payments in this municipal context. However, whether conducted by the tax collector or by private parties, installment payment plans serve the same goal; namely, the avoidance of foreclosure. We see no reason for inferring that the necessary authorization to local governments to engage in that process somehow suggests disapproval of installment payments between private parties.
The Act expressly recognizes that TSCs may be satisfied by direct dealings between the parties. For example, the Act provides that an aggrieved taxpayer "shall have a right of action to recover back the full amount paid by him to such tax lien holder ...." N.J.S.A. 54:5-63.1 (emphasis added). Moreover, N.J.S.A. 54:5-105 entitles the owner to cancellation upon "proof *673 that the holder of the tax sale certificate has been fully paid," and N.J.S.A. 54:5-107 authorizes an owner to bring a Superior Court action against the "holder of record of the tax sale certificate...." The TSC form is further proof of the right of direct dealings between the holder and the owner. It contains three alternative sections authorizing the county recording officer to cancel the TSC of record; one for the municipality, one for a private corporation, and one for a private individual.
Since the owner may deal directly with the TSC purchaser, and then the county recording officer, without the involvement of the tax collector, it is evident that the Legislature was not particularly concerned about local record keeping with respect to these private transactions, trusting instead to the ability of the parties to look after their own interests, with aid of the courts if needed. Whether the owner pays in one lump sum or over time, the tax collector is still not involved, unless the owner chooses to pay the TSC purchaser in a lump sum through the collector. Therefore, the general concept of private installment plans is not inconsistent with the Act simply because the tax collector may not be involved in the process.
The trial court next considered the impact of Brewer v. Porch, supra, concluding that under that case the parties could have no rights other than those established by the Act. Brewer, whose holding concerned a question of implied repealer having nothing to do with the case at hand, reiterated the well-settled propositions that "`municipal liens, and the rights arising therefrom, are solely statutory in origin and are fixed and determined by the statute.'" 53 N.J. at 173, 249 A.2d 388 (quoting Dvorkin v. Dover Township, 29 N.J. 303, 319, 148 A.2d 793 (1959)). But that principle provides no guidance for the issue we are addressing because we are not concerned in this case with rights arising under the Act. Rather, the question is whether we should invalidate the additional rights created by the parties in their private contractual undertakings as somehow violative of the Act. Neither Brewer nor Dvorkin say anything about that subject.
The trial court, citing N.J.S.A. 54:5-55, 61, and 62, then faulted the IPPs in question because they convert an in rem obligation into personal debt, involve costs and fees in excess of those permitted by the Act, and the collection of those fees and costs before redemption and without the filing of an affidavit. Assuming all that to be so, the point given insufficient weight by the trial court is that defendants neither exacted anything from plaintiffs, nor demanded that excess monies be paid for ordinary redemption. Rather, they offered to give up their statutory right to foreclose for a number of years in return for the obligations set out in the IPPs. Plaintiffs were free to reject the offer, which would have left them with the option of making a lump sum payment to defendants or the tax collector. These were voluntary agreements, and the consideration flowing to these plaintiffs was substantial. In Sacks Realty, supra, where the court found an implicit violation of the legislative purposes, it based its opinion in large part on the fact that the intended beneficiaries of the statute "gave up valuable statutory protections for, effectively, no consideration at all." 317 N.J.Super. at 268, 721 A.2d 1011. Here the opposite is true.
Last, the trial court expressed concerns about what it deemed to be "partial redemptions," namely situations in which the owner in a foreclosure proceeding has made some payments to the TSC purchaser and then decides to redeem in full. The problem identified by the trial court was that the owner might have to pay the full *674 sum due under the TSC, while relying on the holder to return the overpayment. The trial court assumed that the payments could only be made to the tax collector, citing N.J.S.A. 54:5-54 and Rule 4:64-6(b), with the potential result that plaintiffs, charged in full by the tax collector, might have to sue defendants for the return of payments previously made under the IPP. But if the case is in foreclosure, we do not read either the statute or the rule as forbidding its resolution by an order directing payment to the TSC holder in return for endorsement and surrender of the TSC. On the other hand, if foreclosure proceedings have not been instituted, the owner can avoid overpayment by paying the balance due to the holder directly. If the owner chooses to deal through the tax collector, and as a result has to temporarily pay more than the amount due, we would view that detriment as fully justified by the consideration received in return for entering the IPP.
In Absecon Land Co. v. Keernes, 101 N.J. Eq. 227, 137 A. 429 (E. & A.1927), the court made the following statement on which plaintiffs heavily rely:
Whenever a statute limits a thing to be done in a specified way, it necessarily includes in itself a negativenamely, that the thing shall not be done otherwise. Expressio unius est exclusio alterius.

[Id. at 231, 137 A. 429 (citation omitted).]
Plaintiffs offer that maxim, which seems to have been the unstated underpinning of the trial court's opinion, to support the proposition that since private installment agreements are not specified by the Act as a method of redemption, while public installment agreements are, the private agreements must be prohibited. However, in Allstate Ins. Co., supra, the Court observed that "[a]t best this maxim is merely an aid in determining legislative intent, not a rule of law. Moreover, great caution is necessary in its application, for blind and mechanical application can often lead ... to an improper interpretation of the statute being construed." 104 N.J. at 8, 514 A. 2d 832 (citations and internal quotes omitted). The United States Supreme Court has even more strongly condemned this hoary maxim:
We also reject application of the maxim of statutory construction, expressio unius est exclusio alterius. As we [have previously stated], such canons long have been subordinated to the doctrine that courts will construe the details of an act in conformity with its dominating purpose.
[Herman & MacLean v. Huddleston, 459 U.S. 375, 387 n. 23, 103 S.Ct. 683, 690 n. 23, 74 L.Ed.2d 548, 558 n. 23 (1983) (citations and internal quotes omitted).]
The Act's primary purpose is "to encourage tax sale foreclosure so as to assist municipalities in the collection of delinquent taxes." Lonsk v. Pennefather, 168 N.J.Super. 178, 182, 402 A.2d 259 (App.Div.1979), certif. denied, 82 N.J. 285, 412 A.2d 792 (1980); see also N.J.S.A. 54:5-85; Bron v. Weintraub, 42 N.J. 87, 91, 199 A.2d 625 (1964). IPPs enhance the value of TSCs, thereby improving the municipality's tax collection efforts. Consequently, the Act's primary purpose is served by recognizing IPPs as valid transactions. One of the Act's secondary purposes is to protect the delinquent taxpayer from unfair treatment by the TSC holder. Initially this secondary purpose was served solely by giving taxpayers the alternative option of satisfying liens by payment to the tax collector. N.J.S.A. 54:5-54. Over twenty years later, the Legislature determined that further protection was warranted. Thus, N.J.S.A. *675 54:5-63.1, as amended by L. 1941, c. 83, p. 195, § 1, provides as follows:
Any holder of a tax sale certificate, excepting any municipal corporation, his agent, servant, employee or representative, who knowingly charges or exacts any fee or charge in connection with the redemption of any tax sale certificate owned by him, in excess of the amounts permitted by chapter five of Title 54 of the Revised Statutes, shall forfeit such tax sale certificate to the person who was charged such excessive or unlawful fee and the person paying such unlawful charge shall become vested with all the right, title and interest of such tax sale certificate holder in and to such tax lien. In addition thereto the person aggrieved shall have a right of action to recover back the full amount paid by him to such tax lien holder, by an action at law in any court of competent jurisdiction.
The collection of any excessive charge or fee in connection with the redemption or assignment of a tax sale certificate shall be deemed prima facie evidence of the fact that such tax sale certificate holder did knowingly charge and exact such excessive fee or charge within the intent of this act.
This statute was enacted to "prevent frauds in connection with the redemption of tax sale certificates," Statement attached to S.87 (Introduced Feb. 10, 1941), and to make "certain that delinquent tax payers shall not, on redemption, be required to pay more than the statute requires," Statement attached to S.88 (Introduced Feb. 10, 1941).
Apart from the situation where, as here, an IPP is supported by substantial consideration, knowingly exacting or accepting payments beyond those allowed by the Act would subject the TSC holder to the penalties provided by N.J.S.A. 54:5-63.1. Thus, the Act fully protects owners who want to redeem in the ordinary course in two ways: they can pay the tax collector, N.J.S.A. 54:5-54, or they can pay the holder, aided by the protections afforded by N.J.S.A. 54:5-63.1. There is no public policy reason for interpreting this statutory scheme more intrusively by insisting that the parties to a TSC cannot improve their lot by contract, provided of course that it is supported by adequate consideration.[7]
Reversed and remanded for entry of judgments dismissing the complaints with prejudice.
NOTES
[1] Incorrectly designated "Bankers Trust FBTLC II" in the complaint.
[2] The holder of the tax title shall be entitled to fees and expenses in ascertaining the persons interested in the premises sold, but such fees and expenses shall not exceed in all the sum of twelve dollars, and the holder shall also be entitled for his expenses, to such sums as he may have actually paid for recording the certificate. In addition, and upon compliance with the provisions of R.S.54:5-62 the holder shall also be entitled for his expenses, to such sums as he may have actually paid for necessary advertising in a newspaper under this chapter and fees for services of notices necessarily and actually served. Such fees and expenses shall be separate, apart from and in addition to those fees permitted under section 7 of P.L.1965, c. 187 (C. 54:5-97.1) and R.S.54:5-98. Upon redemption in accordance with R.S.54:5-58, R.S.54:5-59 and R.S.54:5-60 the holder of the tax title shall be entitled to collect from the owner or other persons having a right of redemption pursuant to R.S.54:5-54, additional sums in accordance with the following schedule: When the tax title certificate amount shall exceed the sum of two hundred dollars, the holder, upon redemption of the tax title shall be entitled to collect from the owner or other person having an interest in the lands an additional sum equal to two per cent of the amount so paid for the tax title certificate.

When the tax title certificate amount shall exceed the sum of $5,000, such additional sum shall be equal to 4% of such amount paid; and when the tax title certificate amount exceeds $10,000, such additional sum shall be equal to 6% of such amount paid. This section shall also apply to all existing tax title certificates held by municipalities on the effective date of P.L.1991, c. 75.
[3] The collecting officer on receiving payment in full shall execute and deliver to the person redeeming a certificate of redemption which may be recorded with the register of deeds, or if there is no register, with the county clerk. The county clerk or register, as the case may be, shall, on request, note on the record of the original certificate of sale a reference to the record of the certificate of redemption, and shall be entitled therefor to the same fees as provided respectively for the cancellation of mortgages and for the record of discharges thereof, or, at the option of the person redeeming, the collecting officer shall procure and deliver to the owner the certificate of sale receipted for cancellation by indorsement in the same manner required by law to satisfy or cancel a mortgage, whereupon the record of the certificate of sale shall be canceled by the county clerk or register, as the case may be, in the same manner and for the same fees as in the case of mortgages.
[4] No such fees or expenses incurred pursuant to R.S.54:5-61, shall be collectible, unless such redemption is made by payment to the collecting officer and unless the holder of the tax title shall have made and filed with such collecting officer affidavits showing the amount or amounts of such expenses actually disbursed or incurred, affidavits of service, including copies of the notices served, and certificates of the searches made in the form of an abstract of title covering a period of not less than twenty years.
[5] Except as hereinafter provided, the owner, his heirs, holder of any prior outstanding tax lien certificate, mortgagee, or occupant of land sold for municipal taxes, assessment for benefits pursuant to R.S.54:5-7 or other municipal charges, may redeem it at any time until the right to redeem has been cut off in the manner in this chapter set forth, by paying to the collector, or to the collector of delinquent taxes on lands of the municipality where the land is situate, for the use of the purchaser, his heirs or assigns, the amount required for redemption as hereinafter set forth.
[6] Dismissal Upon Redemption. In such actions redemption shall be made in the action only, provided notice of the action has been filed in the tax collector's office. Redemption shall be ordered made to the tax collector of the municipality at the collector's official office during business hours but if the tax collector is a part-time official with no regular municipal office, the redemption shall be ordered made to the county clerk at the clerk's official office in the court house. Redemption may be made at any time until the entry of final judgment, and when made, plaintiff, plaintiff's attorney, or the tax collector shall file an affidavit with the clerk setting forth that redemption has been made as to any parcel of land described in the complaint. Upon the filing of the affidavit redemption shall be deemed to be made in the action and an order shall be entered dismissing the action as to the parcel redeemed.
[7] The Consumer Fraud claim was based solely on the supposed violation of the Act. Since the Act was not violated, that claim needs no discussion.