839 A.2d 90 (2004)
365 N.J. Super. 304
Nicholas W. MINOIA, Plaintiff-Appellant,
v.
Charles KUSHNER; W.R. Properties Associates, LP; Clinton Building Associates, LLC; Columbia Title Agency, LLC; Columbia Title Corp.; Hamburg Building Corp.; Hamburg Building Associates, LLC; Kushner Companies; Little EGG Building Associates, LLC; Little EGG Building Corp.; Marlton Building Associates, LLC; The Landings, Inc.; The Landings at Harborside, LLC; Sea Oaks Building Associates, LLC; Westminster Capital Associates, LLC; Westminister Communities; Westminster Management Associates, LP; Westminster Mortgage Brokerage Co., LLC; Westminster Realty and Sales Associates, LLC; Westminster Realty Corp., Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued December 2, 2003.
Decided January 6, 2004.
*91 David Feinsilver, Millburn, argued the cause for appellant (The Feinsilver Law Group, attorneys; Mr. Feinsilver and H. Jonathan Rubinstein, on the brief).
Arthur S. Goldstein, West Orange, argued the cause for respondent Charles Kushner (Wolff & Samson, attorneys; Mr. Goldstein, on the brief).
Before Judges PRESSLER, CIANCIA and ALLEY.
The opinion of the court was delivered by PRESSLER, P.J.A.D.
Plaintiff Nicholas W. Minoia appeals from the summary judgment dismissing his complaint against defendants, Charles Kushner and a group of partnerships controlled by Kushner. We affirm.
The Kushner defendants are real estate developers. Plaintiff joined the Kushner enterprises in April 1998 pursuant to an "Employment/Partnership Agreement" executed by plaintiff and Charles Kushner. The relationship was severed two and a half years later when plaintiff gave notice of resignation on September 30, 2000, effective October 30, 2000. Following negotiations between the parties, they executed a form of settlement agreement on November 30, 2000, by which the parties exchanged mutual general releases and plaintiff received a payment of $178,000. Plaintiff commenced this action by verified complaint some fifteen months later. The gravamen of the complaint was that upon severance of their relationship defendants withheld substantial money due him under their 1998 agreement and that the severance of the relationship was actually a constructive and wrongful termination by defendant Kushner, whose conduct was allegedly outrageous, entitling plaintiff to both contract and tort damages.
Defendants moved for summary judgment prior to filing their answer and, of course, prior to any discovery. Defendants relied on their statement of material facts and supporting certifications to which plaintiff responded in accordance with R. 4:46-2(a) and (b). It was defendants' position that all of plaintiff's claims were barred by the November 2000 settlement agreement in which each of the parties had released the other from all claims arising out of the relationship. Plaintiff's response was that he was not bound by that agreement because the agreement was void and unenforceable. More particularly, *92 he asserted that the agreement violated the New Jersey Wage Payment Law, N.J.S.A. 34:11-4.1 to 4.14, and specifically, N.J.S.A. 34:11-4.7, which prohibits an employer from, among other actions, entering into an agreement with its employee withholding or reducing wages already earned. Plaintiff also asserts that the November 2000 agreement is void because of lack of consideration, economic duress and unconscionability. The trial judge rejected all of these theories as unsupported by the record on the motion and granted the motion.
While we are aware that ordinarily decision on a summary judgment should be withheld until completion of discovery, nevertheless, discovery need not be undertaken or completed if it will patently not change the outcome. See, e.g., Wellington v. Estate of Wellington, 359 N.J.Super. 484, 496, 820 A.2d 669 (App.Div.), certif. denied, 177 N.J. 493, 828 A.2d 920 (2003); Smith v. Estate of Kelly, 343 N.J.Super. 480, 502, 778 A.2d 1162 (App.Div.2001); Kaczorowska v. National Envelope Corp., 342 N.J.Super. 580, 591-592, 777 A.2d 941 (App.Div.2001). Our review of the record satisfies us that this is such a case and that plaintiff's papers do not demonstrate a prima facie basis for relief. Summary judgment was therefore appropriately granted. See Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995).
These are the undisputed facts. Plaintiff was highly experienced in the residential construction and development business and was a principal in a title company. Charles Kushner desired his services as a significant contributor to the operation of the Kushner enterprises. The parties themselves apparently negotiated and drafted their initial agreement, denominated "Employment/Partnership Agreement." The salient terms of that agreement were as follows. Plaintiff was given a twenty percent partnership interest with no capital investment "in all development deals acquired from the date of this agreement" with a single identified project excepted. He was also given a five percent partnership interest in existing residential and commercial properties acquired by Kushner which "are brought in or are largely the efforts of Minoia." In addition, "as an incentive for joining the company," plaintiff was to have a 20% partnership interest in a group of scheduled deals that predated the agreement. Beyond these partnership interests, plaintiff was to receive a base salary of $200,000 per year and additional compensation of $1,000 "per house closing for those deals that Minoia is not a partner." Finally, it was agreed that plaintiff would be president of Westminster Communities, one of the Kushner operations, and a managing director of the Kushner Companies. According to plaintiff's certification, his initial demand was for an annual income of about $600,000, and the base-salary and house-closing compensation constituted a device to reach that sum until the partnership interests began to pay off.
It appears from the record that for the first year or so of plaintiff's affiliation with the Kushner companies, all went well. It is plaintiff's assertion that at some point, Charles Kushner came to believe that the original agreement was too generous and began a campaign to hound plaintiff out of the company, a tactic, he asserts, that finally led to his resignation.
Following the notice of resignation, the settlement agreement, in the form of a letter agreement, was negotiated. Both the original and final draft, prepared by Kushner's general counsel, began with this statement of its scope:
This letter agreement and release ("Agreement") contains all understandings between us with respect to your voluntary resignation and separation *93 from (i) all consulting, independent contractor agreements, commission agreements, operating agreements, entities, ventures and all agreements and arrangements of any nature, and (ii) employment with W.R. Properties Associates, L.P., and all affiliates including the family of entities commonly known as Kushner Companies (and all its affiliates) and including but not limited to all Operating, Limited Partnership, Limited Liability Company and other entities without limitation and including the officers and the principals thereof such as Charles Kushner, Richard Stadtmauer and Jeffrey Freireich (collectively referred to throughout this Agreement as "Employer.") By signing this Agreement you are resolving any and all issues and claims related to your employment with Employer and your separation from such employment. This Agreement also applies to independent contractor agreements and arrangements and all arrangements, written and oral between Employer and you, including without limitation, Employment Agreements, Partnership and Operating Agreements, Commission and all other agreements for the payment of money or shares of ownership in Employer ventures and projects which were operative prior to or during the course of employment. Subject only to the next succeeding paragraph, this Agreement is intended to be and constitutes a complete and final severance of all ties, employment and otherwise, between you and Employer. There are no other written or oral agreements regarding your separation from employment with Employer aside from what is written in this letter agreement and release.
As finally drafted and executed, the agreement provided that Kushner would pay plaintiff $178,500, an amount specified as including "without limitation any and all distributions from partnerships or limited liability companies to which you are or may be entitled to claim now or in the future." The agreement also included mutual general releases. We note that Kushner had originally offered a payment of $160,500, representing the compensation of $1,000 for the house closings in three developments. Plaintiff, however, sought an additional $18,000 representing twenty percent of a $90,000 holdback in the distribution from one of the partnership deals. He also requested that the release, which originally ran only from him to Kushner be mutual, a matter of some providence in view, as it turned out, of subsequent third-party litigation claiming defective construction of projects plaintiff had overseen. In any event, the agreement incorporated the changes requested by plaintiff and was executed on November 30, 2000. We further note that the agreement gave plaintiff twenty-one days in which to consider the agreement before its execution and to consult counsel in that regard. It also contained an acknowledgement that plaintiff executed the agreement "freely and voluntarily and not as a result of any coercion, duress or undue influence, and that you have had adequate time to understand the contents of this letter." The agreed upon sum was paid to plaintiff on the day he executed the agreement, and nothing further was heard during the fifteen months that ensued before this complaint was filed.
We consider plaintiff's claim under N.J.S.A. 34:11-4.7 in the light of these facts. As we have noted, the complaint asserts that he was actually owed some $350,000 for house closings, not the $160,000 he received. He then asserts that the house-closing compensation constituted wages under the Act, which defines *94 wages as "the direct monetary compensation for labor or services rendered by an employee, where the amount is determined on a time, task, piece, or commission basis excluding any form of supplementary incentives and bonuses which are calculated independently of regular wages and paid in addition thereto." N.J.S.A. 34:11-4.1c. Plaintiff claims that because this form of compensation, $1,000 per house closing, constituted wages, any agreement required of him by Kushner to accept less than he had already earned was null and void pursuant to N.J.S.A. 34:11-4.7. He thus argues that the November 2000 agreement was a proscribed agreement, relieving him of its general release provisions.
We agree that where an employee's compensation is in the form of commission, the Act applies. See generally Winslow v. Corporate Express, Inc., 364 N.J.Super. 128, 834 A.2d 1037 (App.Div.2003). We are also aware that the parties characterize the house-closing compensation here quite disparately. Plaintiff urges that it is included commission, and defendants urge that it is an excluded bonus or incentive not part of regular wages. We need not address that dispute, however, because there is a more fundamental basis for our conclusion that the Act does not apply to the November 2000 agreement.
In our view, the difficulty with plaintiff's reliance on the Act lies in the unique hybrid relationship between the parties expressed both in the original "Employment/Partnership Agreement" and the letter settlement. Clearly, plaintiff was not simply a high-level executive employee with a high-level compensation package. He was also a partner with a significant proprietary interest in the Kushner operations. There is no question but that plaintiff's compensation package set forth in the original agreement was an integrated combination of wages, bonuses or commissions, and, most significantly, partnership distributions. Not only did the above-quoted recital make clear that the settlement agreement encompassed the whole integrated wage, incentive, and partnership distribution package, but, moreover, plaintiff himself referred to that agreement as the "winding up [of] all the various interests."
Neither the parties' research nor our own has revealed a reported decision under either the New Jersey Act or cognate federal legislation dealing with an integrated hybrid scheme such as this purporting to resolve not only wage claims but wage claims as an integral component of proprietary distribution interests. Considering plaintiff's claim that the potential value of his proprietary interest in the Kushner enterprises was in the neighborhood of 23 million dollars, a characterization of the settlement agreement as an employee's release of a wage claim simply defies the sense of plaintiff's complex and intertwined rights. In sum, we are persuaded that no single element of the total package agreed to in 1998 is conceptually separable from the others, and that is true of the settlement agreement as well. We therefore conclude that the Act posed no impediment to the parties' settlement agreement by which they "wound-up" their integrated bundle of rights and liabilities.
With respect to plaintiff's remaining arguments, there is nothing in his moving papers, augmentable by discovery, supporting any of his theories. The contention that there was no consideration for the agreement is without merit. It has been well-settled for at least a century and a half that consideration lies in the mutuality of releases. See, e.g., Administrators of Ackerman v. Executor of Vreeland, 14 N.J. Eq. 23, 28 (Ch. 1861). And see Restatement *95 (Second) of Contracts §§ 74 and 75 (1981).
The economic duress claim plaintiff makes is based on his need for money at the time he executed the settlement agreement because of difficult divorce proceedings he was going through, the fact that he had a cash-flow problem because he had significant assets tied up in the construction of a house, and because of downturns in the stock market. While plaintiff may well have felt pressured by these developments, they do not constitute economic duress in the legal sense, which has been defined as a wrongful or unlawful act that deprives the victim of his unfettered will. See, e.g., Quigley v. KPMG Peat Marwick, L.L.P., 330 N.J.Super. 252, 263, 749 A.2d 405 (App.Div.), certif. denied, 165 N.J. 527, 760 A.2d 781 (2000). See also Whalen v. Schoor, DePalma & Canger Group, Inc., 305 N.J.Super. 501, 508, 702 A.2d 1311 (App.Div.1997) (duress defined as a party having overwhelming economic power using its dominance to exert wrongful pressure on the other). We think it plain that plaintiff's need for money in the absence of any claim by him of deprivation of free will by reason of defendant's conduct simply does not amount to economic duress remediable in law.
Nor do plaintiff's papers suggest a prima facie case of unconscionability. The settlement was negotiated, not dictated. See, e.g., Howard v. Diolosa, 241 N.J.Super. 222, 230, 574 A.2d 995 (App.Div.), certif. denied, 122 N.J. 414, 585 A.2d 409 (1990). Plaintiff was free to seek better terms and to seek judicial recourse if he felt that he had been exploited or economically abused. The additional terms he requested were all incorporated. The fact of the matter, undeniable from this record, is that plaintiff made a conscious and voluntary decision, based on his perceived need for money, to enter into the settlement agreement. After-thoughts about how much more he might have been able to receive do not render the settlement agreement he decided to accept unconscionable or the product of economic duress.
The summary judgment dismissing the complaint is affirmed.