853 A.2d 865

JOHN VARSOLONA, RUTH J. FAILS, GARRETT E. REED, JR., AND GWENDOLYN C. REED, SUING INDIVIDUALLY AND ON BE-HALF OF ALL OTHER SIMILARLY SITUATED PLAINTIFFS, PLAINTIFFS–APPELLANTS, v. BREEN CAPITAL SERVICES CORP., FBTLC TRUST II, BANKERS TRUST COMPANY, AND GTL INVESTMENTS, L.P., DEFENDANTS–RESPONDENTS AND BANKERS TRUST, JOHN DOES 1 THROUGH 5 AND ABC CO. 1 THROUGH 5, DEFENDANTS.

LOUISE GARRETSON, INDIVIDUALLY AND ON BEHALF OF ALL OTHER SIMILARLY SITUATED PLAINTIFFS, PLAINTIFF–APPELLANT, v. CSFBTLC TRUST II, A DELAWARE STATUTO-RY TRUST, BANKERS TRUST COMPANY, BREEN CAPITAL SERVICES CORP., A NEW JERSEY CORPORATION, DEFEN-DANTS–RESPONDENTS, AND JOHN DOES 1 THROUGH 5, AND ABC CO. 1 THROUGH 5, DEFENDANTS.

Argued February 3, 2004—Decided July 28, 2004.

606

608

*Peter S. Pearlman* argued the cause for appellants (*Cohn Lifland Pearlman Herrmann & Knopf,* attorneys; *Jeffrey W. Herrmann,* on the briefs).

*Kevin McNulty* argued the cause for respondent Bankers Trust Company (*Gibbons, Del Deo, Dolan, Griffinger & Vecchione,* attorneys).

*Andrew T. Solomon* argued the cause for respondents Breen Capital Services Corp., and GTL Investments, L.P. (*Parker McCay & Criscuolo,* attorneys; *Stacy L. Moore, Jr.,* on the letter in lieu of brief).

*Gary F. Eisenberg* argued the cause for respondents FBTLC Trust II and CSFBTLC Trust II (*Windels Marx Lane & Mittendorf,* attorneys).

*Michael I. Gross* submitted a brief on behalf of *amicus curiae* The National Tax Lien Association (*Cooper Levenson April Niedelman & Wagenheim,* attorneys).

*Michael J. Gilmore* submitted a letter in lieu of brief on behalf of *amicus curiae* Tax Collectors and Treasurers Association of New Jersey (*Gilmore & Monahan,* attorneys).

Justice LaVECCHIA delivered the opinion of the Court.

These consolidated appeals involve two class action lawsuits stemming from bulk sales of tax liens by the City of Jersey City (Jersey City). In 1993 and again in 1994, Jersey City securitized its large inventory of tax liens, selling them to a trust, which in turn sold bonds in anticipation of revenue from the purchased liens. In these actions, plaintiffs specifically challenge the private installment payment plan agreements (IPPs) that allowed a prop-

erty owner whose property was subject to a transferred tax sale certificate (TSC), to make payments toward redemption in equal monthly payments of principal and interest directly to the purchaser and holder of the TSCs, or to a representative of the holder. Plaintiffs claim that the IPPs were unauthorized by, and inconsistent with, the Tax Sale Law, *N.J.S.A.* 54:5–1 to –137(TSL), and that they also were violative of the Consumer Fraud Act, *N.J.S.A.* 56:8–1 to –135(CFA). The trial court granted summary judgment to plaintiffs and awarded plaintiffs in excess of $30 million in treble damages under the CFA. On appeal, the Appellate Division reversed and remanded for entry of an order dismissing plaintiffs' complaints. *Varsolona v. Breen Capital Servs. Corp.*, 360 *N.J.Super.* 292, 822 *A.2d* 663 (2003). We granted certification, 177 *N.J.* 571, 832 *A.2d* 322 (2003).

## I.

### A.

The sale of tax liens is a municipal financing option that provides a mechanism to transform a non-performing asset into cash without raising taxes. Georgette C. Poindexter, Lizabethann Rogovoy & Susan Wachter, *Selling Municipal Tax Receivables: Economics, Privatization, and Public Policy in an Era of Urban Distress*, 30 *Conn. L.Rev.* 157, 158 (1997). The concept of "securitization" of tax liens has been described succinctly as follows:

> Securitizations bundle individual liens and sell income stream from the bundle to investors.... In the general method of securitization, the municipality sets up a trust to take title to the tax liens and then the trust issues bonds backed by the revenue stream from those lien[s] and secured by the eventual right of foreclosure on the underlying property. The success of tax lien securitization deals rests on the ability of the servicer ... to find delinquent taxpayers and collect back taxes owed.
>
> In addition to the up-front payment, the municipality often takes a subordinate position (after payment to bondholders) with respect to a portion of the outstanding liens, usually around thirty percent. The effect of the subordinate position is to give the municipality a percentage interest in the amount collected over the amount necessary to satisfy the principal and interest payments to bondholders. Although a municipality may not receive as much money at the outset of a securitization deal,

it has the potential to recover the full amount of the taxes and the interest due, which makes it an attractive option for some municipalities.

[*Id.* at 173–74 (footnotes omitted).]

The basic structure of a tax lien securitization involves the establishment of a trust that has as its sole purpose the purchase of eligible tax lien receivables from one or more jurisdictions.... After the trust purchases the tax liens, it then issues bonds that are backed by the tax lien receivables. These bonds are purchased by investors, usually in the institutional market. A portion of the proceeds from the sale of the bonds is used to pay the municipality for the sale of the tax liens. In a typical securitized tax lien transaction, the amount of the bonds issued is less than the face amount of the tax liens purchased by the trust from the municipalities. Usually, the trust will issue bonds at approximately seventy to eighty percent of the face amount of the liens it purchased. The overcollateralization provides additional security to rating agencies and investors.

[*Id.* at 186–87 (footnotes omitted).]

In the early 1990s, Jersey City was experiencing fiscal difficulties associated with a low property tax collection rate. Municipal officials embarked on a plan to convert tax liens[1] into cash through the process of securitization. We summarize only the general features of the transaction because the challenge here is not to the transaction itself, but rather concerns the impact of the transaction on the affected property owners. Briefly then, in 1993 Jersey City first executed a purchase and sale agreement in which it transferred TSCs to a special purpose trust, CSFBTLC Trust I (Trust I). Trust I transferred the TSCs to CSFBTLC Trust II (Trust II) on the signing of a note. Under the purchase money note executed in the 1993 transaction, Trust I promised to pay to Jersey City approximately $19 million, together with an interest rate of 28 percent per annum, on or before June 1, 2013. All payments of principal and interest were to be subordinate to the payment of sums due to bondholders. A tax lien collateralized bond of over $31 million was issued by Trust II to First Boston Corporation in which Trust II promised to pay the collateralized amount on or before December 25, 2000, and to pay interest up to

---

[1] All taxes assessed on lands "shall be a continuous lien on the land on which they are assessed and all subsequent taxes, interest, penalties and costs of collection which thereafter fall due or accrue shall be added to and be a part of the initial lien." *N.J.S.A.* 54:5–6.

that time at 8.25 percent per annum. In short, the tax sale certificates served as collateral for the bonds sold to investors and for the promissory note, which generated immediate funds for Jersey City.

The bonds issued by Trust II were sold to institutional investors, which then sold the bonds to the public. As noted, the securitizations occurred in waves: the first in 1993 and the second in 1994. The 1993 securitization consisted of approximately 2500 TSCs, of which 434 property owners entered into IPPs. In the 1994 transaction, Jersey City raised approximately $14 million—partly in cash and partly in another note. That securitization was smaller in scale, consisting of approximately 1220 TSCs, of which 145 property owners entered in IPPs.

Importantly for purposes of this appeal, Jersey City executed a master service agreement in connection with these transactions, in which it granted the designated "Master Servicer" the authority to enter into installment payment plans with property owners:

Section 7.03. Installment Payment Plans. The Master Servicer is hereby authorized to enter into installment payment plans relating to the redemption of Tax Liens with Property Owners and may negotiate the individual terms and conditions of such installment payment plans in its sole discretion so as to maximize the amount reasonably recoverable in respect of the Tax Liens, provided that (a) the total aggregate amount due and payable by the Property Owner pursuant to such payment plan shall be no less than the Tax Lien Balance of such Tax Lien calculated through and including the next succeeding Payment Date after the date upon which the final payment under such payment plan has been received, (b) the Property Owner has agreed to make all payments pursuant to such payment plan to the Master Servicer rather than the City Collector and the Master Servicer agrees to hold the funds resulting from such payments in an Eligible Account or Accounts located at the Master Servicer ... and to deliver such funds to the City Collector upon the payment in full by the Property Owner of all amounts required thereunder to permit redemption of such Tax Liens, and (c) such payment plan is evidenced by a written agreement executed by each of the Master Servicer and the Property Owner, a copy of which shall be delivered to the Related Parties promptly after its execution.

Bankers Trust Company (Bankers Trust) served as the Master Servicer for the Trust, and was responsible to the Trust and to Jersey City for the collection of the funds. As part of the bond-issuance agreements, Breen Capital Services Corporation (Breen

Capital), a company with expertise in administering and liquidating TSCs, was designated to handle day-to-day collection and servicing of the TSCs. Thus, Breen Capital (pursuant to a submaster servicer agreement) was the entity that would enter into IPPs with the property owners. Property owners whose property was subject to a TSC had three options: (1) accept the IPP with eighteen percent interest; (2) redeem the TSC in a lump sum; or (3) submit to foreclosure. Property owners who elected to enter into an IPP retained the right to redeem the TSC at any time by complying with the redemption procedures contained in the TSL.

Breen Capital contacted delinquent property owners by means of a letter that contained information about the opportunity to enter into an IPP. The form of IPP typically required the property owner to pay a specified sum, less a down payment, at eighteen percent interest per annum in thirty-six equal monthly installments of a specified amount. The record contains the following example of an IPP issued by Banker's Trust in 1993:

I hereby agree to redeem that Tax Sale Certificate in the following manner:

I promise to pay to Bankers Trust, as Collateral Agent, c/o Breen Capital Service Corp .... the sum of ... less any Down Payment Amount to be paid [ ] with interest thereon at the rate of 18% per annum from the date hereof payable in (36) equal monthly installments ... commencing on 1/1/94 and thereafter on the first day of each consecutive succeeding calendar month until such balance is paid in full.

If I fail to make any installment payment when due, I will be in default. If I fail to make the payment necessary to cure a default within ten (10) days after written notice, I understand and acknowledge that the whole amount due to redeem the Tax Sale Certificate shall become immediately due and payable with interest at the rate of 18% per annum.

* * *

THIS AGREEMENT DOES NOT CONSTITUTE A WAIVER OF THE RIGHT TO FORECLOSE THE TAX SALE CERTIFICATE DESCRIBED HEREIN. IN THE EVENT THIS AGREEMENT IS NOT FULLY PERFORMED AND I AM IN DEFAULT, BANKERS TRUST OR ITS ASSIGNEE WILL BE ENTITLED TO ANY ONE OR MORE OF THE FOLLOWING FORMS OF RELIEF: FORECLOSURE OF THE TAX SALE CERTIFICATE, A CLAIM UNDER THIS AGREEMENT OR ANY OTHER PROCEEDING PERMITTED BY LAW.

Breen Capital calculated interest based on the sum of the face amount of the TSC plus the interest that had accrued from the date of the certificate to the date of the IPP. That methodology was revised in 1996. Thereafter, Breen Capital calculated interest based only on the face amount of the TSC. It appears to be undisputed that Breen Capital gave retroactive interest credit to property owners who had entered into an IPP that utilized the original interest-calculation methodology, and that the accounts of those property owners have been revised accordingly. Also, interest charges were calculated using a 360-day year to compute the *per diem* interest, and the daily rate then was applied over 365 days.

## B. *Varsolona action*

On March 23, 1998, plaintiff, John Varsolona, filed a class action suit on behalf of property owners whose properties were encumbered with TSCs and who had entered into IPPs. The plaintiffs claimed that the IPPs executed by or on behalf of defendants Bankers Trust, Breen Capital, and GTL Investments, L.P. (GTL) (a Delaware limited partnership that owned a portfolio of tax sale certificates serviced by Breen Capital) were inconsistent with the TSL, beyond the defendants' authority, and violated the CFA.

The trial court certified the class and, after discovery was completed, both parties moved for summary judgment. On December 22, 1999, the trial court granted judgment for plaintiffs. The court determined that the TSL does not permit private parties to enter into IPPs with property owners and held that defendants' solicitation of the IPPs constituted a *per se* violation of the CFA. The court denied reconsideration.

Plaintiffs thereafter sought summary judgment on damages and defendants moved for dismissal based on a statute-of-limitations affirmative defense. The trial court granted plaintiffs' motion and denied defendants' motion. Subsequently, the court entered an order clarifying its judgment, ultimately holding Bankers Trust and Breen Capital jointly and severally liable to the plaintiffs in the amount of $26,784,615.85.

## C. *Garretson action*

On May 5, 2000, plaintiff, Louise Garretson, suing on behalf of a putative class of property owners in Jersey City, filed suit against CSFBTLC Trust II, Bankers Trust, and Breen Capital. The plaintiff class claimed that the IPPs violated the TSL and CFA. The lawsuit was certified as a class action under *Rule* 4:32 for the TSL claim and those parts of the CFA claim that were premised on violations of the TSL. All of the named defendants filed answers. Bankers Trust filed third-party claims against Mellon Bank, Mellon Mortgage Company, and HSBC Bank USA as the Indenture Trustee. The trial court later dismissed Bankers Trust's third-party complaints.

Plaintiffs moved for summary judgment on both liability and damages. The trial court granted the plaintiffs' motion for summary judgment, and ultimately issued a judgment against defendants in the amount of $5,125,056.78. The court also ordered defendants to forfeit the TSCs that had been the subject of IPPs.

## D.

On appeal, the Appellate Division consolidated the Varsolona and Garretson appeals and reversed the judgment of the trial court, essentially on the principle that private contracts not specifically prohibited by statute are generally permitted. *Varsolona, supra*, 360 *N.J.Super.* at 305, 822 *A.*2d 663. The panel summarized the trial court's view of the challenged transactions as follows:

> The trial court inferred that [*N.J.S.A.* 54:5–65 to –75] demonstrate[s] a legislative policy that such agreements be "accessible to the public," and that they were designed "to insure the accuracy of municipal tax records," and "to provide the taxpayer and the public at large with the legally sanctioned means to officially and reliably ascertain the tax status of any real estate property in the State." After asserting that the viability of private installment plans depends on the "nature of the parties' relationship," the trial court referred to the proposition that the rights arising under a tax sale certificate are set by the [TSL], citing *Brewer v. Porch*, 53 *N.J.* 167, 173, 249 *A.*2d 388 (1969), and concluded that "the absence of specific authority read in *pari materia* with the ... provisions of the [TSL], discloses the legislative intent not to allow private installment agreements." The trial court also

found that the IPPs in question ran "counter to the legislative policy" of the [TSL] because they circumvent "the municipal tax collector" and "frustrate the tax collector's ability to carry out ... statutorily prescribed duties." It went on to criticize the IPPs because they involve costs and fees in excess of those allowed by the [TSL] ... as well as their collection before redemption and without the filing of the required affidavit.... Finally, the trial court faulted the IPPs as capable of involving what it termed improper "partial redemptions" in the following setting: a property owner signs an IPP, makes some payments and then defaults; the TSC holder files foreclosure proceedings, and the owner decides to redeem. Based on the literal reading of *N.J.S.A.* 54:5–54 and *Rule* 4:64–6(b), the trial court concluded that the owner's only remedy was to pay the tax collector, rather than the holder, with the result that the owner would have to come up with the entire amount due despite having made some payments to the holder, and would have to rely on the holder's "good faith to return the overpayment, or file a law suit to recover it."
[*Id.* at 302–04, 822 *A*.2d 663 (footnotes omitted).]

The Appellate Division has an entirely different take on the transactions. Noting that the TSL specifically permits municipalities to enter into IPPs and that the statutory scheme does not contain any express prohibition against private installment payment plans, the panel concluded that such plans should be invalidated only if they specifically contravene public policy. *Id.* at 306, 822 *A*.2d 663. Finding none, the panel reversed the judgments in favor of plaintiffs, stating that it perceived no reason to apply the TSL more strictly than its terms required and thereby to prevent "parties to a TSC [from] improve[ing] their lot by contract, provided that it is supported by adequate consideration." *Id.* at 311, 822 *A*.2d 663.

## II.

### A.

Until 1854, taxes on real property operated not as a lien on the land, but instead were enforced like personal property taxes: by distraint and sale of chattels, and by imprisonment of the delinquent taxpayer. *Bea v. Turner & Co.*, 115 *N.J. Eq.* 189, 191, 169 *A*. 832 (Ch.1934). Property taxes were made a lien on the land in 1854, and for many years thereafter such taxes could be collected either by distraint or by the sale of the land. *Id.* at 191, 169 A. 832. In 1863, property owners were granted a right to redeem

their property after one year, *City of Newark v. Yeskel*, 5 *N.J.* 313, 318, 74 *A.*2d 883 (1950), *overruled on other grounds, Township of Montville Twp. v. Block 69, Lot 10*, 74 *N.J.* 1, 376 *A.*2d 909 (1977); however, it was not until 1903 that property owners were authorized to make redemption payments to the collection officer in the event the purchaser of the tax sale certificate either could not, or would not, accept the property owner's payment. *L.* 1903, *c.* 431.

■ In 1918, the TSL was enacted, containing the *requirement* that redemption payments be made to the tax collector. *L.* 1918, *c.* 237. The Appellate Division recently summarized the current tax sale process:

> The process is designed to enhance the collection of taxes. *Bron v. Weintraub*, 42 *N.J.* 87, 91, 199 *A.*2d 625 (1964). When municipal liens are delinquent for the period stated by statute, a lien arises on the land on which the taxes are assessed, *N.J.S.A.* 54:5-6, and the municipality may enforce the lien by selling the property as prescribed by statute. *N.J.S.A.* 54:5-19. The officer holding the sale delivers the purchaser a certificate of sale. *N.J.S.A.* 54:5-46.

> A tax sale certificate is not an outright conveyance. It creates only a lien on the premises and conveys the line interest of the taxing authority. *Chelsea Laundry Co. v. Toscano*, 14 *N.J.Super.* 496, 500, 82 *A.*2d 473 (Ch.Div.1951). Furthermore, the interest of the holder of the tax sale certificate is entirely subordinate to the statutory right of redemption of the property owner. This right of redemption can be exercised up to the date fixed by the court barring the right of redemption. *Manning v. Kasdin*, 97 *N.J.Super.* 406, 417, 235 *A.*2d 219 (App.Div.1967), *certif. denied*, 51 *N.J.* 182, 238 *A.*2d 469 (1968).

> [*Savage v. Weissman*, 355 *N.J.Super.* 429, 435–36, 810 *A.*2d 1077 (2002).]

We note that the TSL is remedial legislation to be liberally construed. *N.J.S.A.* 54:5-3. Its purpose, as expressed by the Legislature, is to encourage the securing of marketable titles to land by barring of the right of redemption by actions in the Superior Court. *N.J.S.A.* 54:5-85. *See also Lonsk v. Pennefather*, 168 *N.J.Super.* 178, 182, 402 *A.*2d 259 (App.Div.1979) (stating that "the public policy in this State is to encourage tax sale foreclosure so as to assist municipalities in the collection of delinquent taxes"), *certif. denied*, 82 *N.J.* 285, 412 *A.*2d 792 (1980). As has been noted:

The underlying purpose of the statutes authorizing municipalities to sell lands for taxes is to enable the municipality to obtain the payment of its taxes without going into the real estate business. The municipality is given a wide variety of statutory methods to hold, and to proceed with, tax sales. It may sell the property therein either to third parties or to itself. It may sell to itself by various methods. When it sells to itself, it may assign the tax sale certificate to a third party....
[*Fidelity Union Trust Co. v. City of Newark,* 11 *N.J.Super.* 205, 208, 77 *A.2d* 820 (Cty.Ct.1950).]

### B.

The tax sale process commences when a bonded official makes searches of municipal records for unpaid liens, and then issues a certificate of search. *N.J.S.A.* 54:5-11 to -13. After the requisite time has passed, the tax collector can sell the tax liens at auction. *N.J.S.A.* 54:5-19; *N.J.S.A.* 54:5-31. The purchaser acquires the lien, with the title, *N.J.S.A.* 54:5-42, and receives a certificate of sale, the TSC. *N.J.S.A.* 54:5-46. Interest on the liens may not be assessed in excess of eighteen percent per annum. *N.J.S.A.* 54:5-32. Until the right of redemption is barred, all subsequent taxes, assessments, and municipal charges are assessed in the name of the property owner. *N.J.S.A.* 54:5-39. A purchaser may record the TSC in the office of the county clerk or register of deeds. *N.J.S.A.* 54:5-50. If the municipality acquires title to the real estate because of the property owner's delinquency, it may, by resolution, authorize a private sale of the tax sale certificate. *N.J.S.A.* 54:5-113. The certificate vests the purchaser with an inchoate right or interest and gives the purchaser the right to foreclose the equity of redemption pursuant to the statutory scheme. *Gasorek v. Gruber,* 126 *N.J.Super.* 511, 515, 315 *A.2d* 706 (App.Div.1974). The inchoate interest consists of three rights: the right to receive the sum paid for the certificate with interest at the redemption rate for which the property was sold; the right to redeem from the holder a subsequently issued tax sale certificate; and the right to acquire title by foreclosing the equity of redemption of all outstanding interests, including that of the property owner. *Jefferson Twp. v. Block 447A, Lot 10,* 228 *N.J.Super.* 1, 4-5, 548 *A.2d* 521 (App.Div.1988).

A property owner may redeem his or her property by paying the TSC purchaser's expenses, including the subsequent taxes on the property, with interest. *Barry L. Kahn Defined Benefit Pension Plan v. Moorestown Twp.*, 243 *N.J.Super.* 328, 334, 579 *A.*2d 366 (Ch.Div.1990); *N.J.S.A.* 54:5–58. The amount required for redemption when the certificate is not held by the municipality includes all subsequent taxes, municipal liens, and charges with interest. *N.J.S.A.* 54:5–60. The "holder of the tax title" is also entitled to collect from the owner two percent of the amount paid for the tax certificate, if the tax certificate amount is between $200 and $5000; four percent when the certificate is between $5000 and $10,000; and six percent when the certificate exceeds $10,000. *N.J.S.A.* 54:5–61.

However, in order to collect those fees and expenses, "payment [must be] made to the collecting officer and ... the holder of the tax title [must] have made and filed with such collecting officer affidavits showing the amount or amounts of such expenses actually disbursed or incurred[.]" *N.J.S.A.* 54:5–62. Upon redemption, the owner is entitled either to cancel the certificate of sale, or to issuance of a certificate of redemption. *N.J.S.A.* 54:5–53.2; *N.J.S.A.* 54:5–55. On receipt of the redemption money, the tax collector is required to mail notice to the purchaser, together with "all redemption moneys." *N.J.S.A.* 54:5–57. If the property is not redeemed within the statutorily prescribed two-year period the purchasers may bring an action to foreclose or bar the property owner's right of redemption. *N.J.S.A.* 54:5–86; *see also Savage, supra,* 355 *N.J.Super.* at 436, 810 *A.*2d 1077. If successful in such an action, the purchaser will take title to the property even if the property's value exceeds the amounts owed. *N.J.S.A.* 54:5–87.

## C.

The TSL authorizes municipalities to enter into IPPs with property owners, *N.J.S.A.* 54:5–65, and details the conditions that apply in respect of such agreements. *See N.J.S.A.* 54:5–65 to –76.

Such agreements must require that payments be made in "sub-stantially equal monthly installments, over a period not exceeding 3 years," *N.J.S.A.* 54:5–68, and compound interest may be applied. *N.J.S.A.* 54:7–71. *N.J.S.A.* 54:5–72 authorizes the use of a "special installment certificate," and requires the collection officer to main-tain on file a duplicate of the certificate and to enter thereon each installment payment made. *See also N.J.S.A.* 54:5–76 (imposing additional payment record-keeping responsibilities on collecting officer). Importantly, if installments are not paid when due or if redemption is not completed within the time fixed by resolution, the municipality may proceed to enforce or foreclosure the tax sale lien, or to sell, assign, transfer, or alienate the certificate for the unpaid balance due. *N.J.S.A.* 54:5–75.

## III.

### A.

Although the TSL expressly authorizes municipalities to enter into IPPs with property owners in respect of TSCs, *N.J.S.A.* 54:5–65, there is no specific provision that addresses whether a munici-pality can authorize a bulk purchaser of its tax liens to enter into IPPs with taxpayers whose property relates to the TSCs that are being transferred by the municipality. The Appellate Division concluded that although the TSL was silent in that respect, allowing a municipality to transfer such authority to a bulk purchaser of its tax liens was not likely to be repugnant to the Legislature.

The Legislature created the TSL as a framework to facili-tate the collection of property taxes. *Dvorkin v. Dover Twp.*, 29 *N.J.* 303, 309, 148 *A.*2d 793 (1959). In 1993, the Legislature enacted *N.J.S.A.* 54:5–113.1 to enable municipalities to engage in the bulk sale of TSCs by allowing the acceptance of a bond, note or other obligation in partial consideration thereof. *L.* 1993, *c.* 113, §§ 1–2. *N.J.S.A.* 54:5–113.1 authorizes such bulk sales in accordance with terms approved in the municipality's authorizing

resolution and as approved by the Local Finance Board of the Division of Local Government Services in the Department of Community Affairs. The statute prescribes the maximum maturity date for the bond, note or other obligation, the principle amount at maturity, the maximum rate of interest that may be imposed, and that the instrument be secured by and payable from the TSCs "in such manner and on such terms and conditions as shall be agreed upon by the governing body." *Ibid.*

We infer from the statute a legislative intention to further facilitate the collection of property taxes by permitting institutional investors to purchase TSCs in bulk and, in turn, to reduce the administrative costs and expedite cash flow for the municipality. *Ibid.* We see nothing in the statutory scheme that indicates a legislative intent to preclude a municipality from authorizing a bulk purchaser and holder of TSCs to enter into IPPs with delinquent property holders, so long as the terms of such IPPs are not inconsistent with the statutory terms that would have protected the taxpayer had it been the municipality itself that executed the IPP. Indeed, we regard it as a natural and fair implication from the TSL that a municipality can transfer its authority to enter into installment payment plans in respect of redemption of the tax lien to private bulk purchasers and holders of TSCs, thereby making the investment more attractive because the holder is not limited to the time-consuming and expense-laden remedy of foreclosure. Thus, by making the bulk sale of TSCs more attractive, the municipality benefits from this method of enhancing the collection of delinquent property taxes without forcing individuals to lose their property to foreclosure.

The primary intent of the TSL is "to enable governments to realize taxes by returning property to the paying tax rolls without first expending money to foreclose or bar the equity of redemption." *Simon v. Deptford Twp.*, 272 *N.J.Super.* 21, 26, 639 *A.*2d 328 (App.Div.) (citing *Dvorkin, supra,* 29 *N.J.* at 309, 148 *A.*2d 793), *certif. denied,* 137 *N.J.* 310, 645 *A.*2d 139 (1994). "One of the [TSL's] secondary purposes is to protect the delinquent

taxpayer from unfair treatment by the TSC holder." *Varsolona, supra,* 360 *N.J.Super.* at 310, 822 *A.*2d 663; *see also N.J.S.A.* 54:5–63.1 (providing for forfeiture of TSC for holder's knowingly charging of unlawful or excessive fees). Indeed, as the legislative statement to *L.* 1941, *c.* 83, § 1 (codified as *N.J.S.A.* 54:5–63.1) indicated, the "statute was enacted to 'prevent frauds in connection with the redemption of tax sale certificates,'... and to make 'certain that delinquent taxpayers shall not, on redemption, be required to pay more than the statute requires.'" *Varsolona, supra,* 360 *N.J.Super.* at 311, 822 *A.*2d 663 (quoting Statement attached to *S.* 87, *S.* 88 (Introduced Feb. 10, 1941)).

The TSL thus creates two rights: a municipality's right to develop innovative ways to collect delinquent property taxes and the delinquent property owner's right to fair treatment in the collection of those taxes. In our view, both can be accommodated. We hold that the municipality's statutory authority to enter into IPPs can be transferred with the bulk sale of its TSCs. However, the purchaser or its agent, acting in furtherance of the securitization contemplated by the authority provided for such bulk sales, must adhere to the TSL's framework of responsibilities and restrictions as imposed on municipalities.

We are persuaded that despite the Legislature's silence in respect of IPPs when it enacted *N.J.S.A.* 54:5–113.1, it comports with the legislative purpose to allow a municipality to authorize a bulk purchaser of TSCs to enter into IPPs in the same manner as could the municipality itself. Indeed, we note that the Legislature since has enacted *L.* 203, *c.* 120 (codified as *N.J.S.A.* 52:27BBB–66 to –79) that provides municipalities experiencing financial difficulties with access to the capital markets for securitizations involving their TSCs through the creation of a Tax Lien Financing Corporation (Corporation). The legislation allows the Corporation to engage in bulk assignment sales of tax liens of multiple municipalities that qualify for participation. *N.J.S.A.* 52:27BBB–67. Importantly, the legislation includes a provision that expressly authorizes the Corporation, when transferring the tax liens of the

qualified municipalities, to "enter into installment agreements with the related taxpayers as if it were a municipality acting pursuant to Title 54 of the Revised Statutes and on such terms as the corporation deems desirable." *N.J.S.A.* 52:27BBB–70m (authorizing IPPs in substantially equal monthly installments over period not to exceed five years).

Although *N.J.S.A.* 52:27BBB–66 to –79 is later-enacted legislation, subsequent legislation may be used by a court as an extrinsic aid when seeking to discern earlier legislative intent. *See Boyd v. Marini,* 132 *N.J.Super.* 324, 328, 333 *A.2d* 559 (App.Div.1975) (citing 2A *Sutherland on Statutory Construction* (4 ed.) § 49.11 at 265 for proposition that doubtful meaning of former statute may be rendered certain by consideration of subsequent legislation that evidences original legislative intent). *See also Edwards v. Mayor of Borough of Moonachie,* 3 *N.J.* 17, 24–25, 68 *A.2d* 744 (1949) (noting that subsequent legislation may be of assistance in determining meaning of earlier enactment); *N.J. Dept. of Envtl. Prot. v. Franklin Twp.,* 181 *N.J.Super.* 309, 328–29, 3 *N.J.Tax* 105, 437 *A.2d* 353 (Tax Ct.1981) (noting use of subsequent legislation as extrinsic aid to interpretation of unclear statutory scheme), *aff'd,* 5 *N.J. Tax* 476 (App.Div.1983); *Longview Co. v. Lynn,* 6 *Wash.2d* 507, 108 *P.2d* 365, 371 (1940) (citing rule of statutory construction, followed in many jurisdictions, that permits consideration of subsequent legislation when deducing legislative intent). From the enactment of *N.J.S.A.* 52:27BBB–66, we can glean that the Legislature considers it appropriate for a municipality to transfer to another its authority to enter into IPPs with a taxpayer whose property is affected by a TSC. Thus, we need not infer from the TSL's silence on the subject, specifically as IPPs relate to bulk sales, that such authority was meant to be denied to a municipality such as Jersey City.

As a final matter, we note that the trial court reached its contrary determination, namely that the TSL's express authorization to municipalities to enter into IPPs evidenced an intent to limit their issuance to municipal governments alone, largely be-

cause it felt constrained by prior decisions generally interpreting the authority conferred by the TSL. Specifically, the trial court relied on the broad language in *Brewer, supra,* that referred to municipal liens, and the rights and interests they convey, as "statutory in origin," and are thus "fixed and determined" by that fount. 53 *N.J.* at 173, 249 *A.*2d 388 (quoting *Dvorkin, supra,* 29 *N.J.* at 319, 148 *A.*2d 793). *See also Realty Asset Prop., Ltd. v. Oldham,* 356 *N.J.Super.* 16, 22, 811 *A.*2d 468 (App.Div.2002) (stating that "[w]e begin our analysis by reaffirming that the rights of a purchaser of a tax sale certificate are solely statutory in origin and are fixed and determined by the Tax Sale Law") (citations omitted), *certif. denied,* 176 *N.J.* 71, 819 *A.*2d 1187 (2003).

*Brewer, supra,* dealt with a question of repeal by implication; specifically, we had to decide whether a TSC holder's right of possession to the land had been abrogated by a subsequent amendment to the statute that had removed language expressly granting possession to the TSC holder. 53 *N.J.* at 173, 249 *A.*2d 388. We observed that we were dealing with two seemingly inconsistent provisions that we had to reconcile, *id.* at 178, 249 *A.*2d 388, and, within that context, stated "[s]ince the rights arising under a tax sale certificate are solely statutory in origin and are fixed and determined by the statute, in the absence of affirmative statutory grant, the holder of a tax sale certificate has no such right [to possession of the land]." *Ibid.* (internal quotation marks omitted). Thus, the TSC holder was not permitted to claim a right to possession of the land, previously conferred by the TSL and about which the TSL was then silent because the Legislature had repealed the express grant of such a right. *Id.* at 178–80, 249 *A.*2d 388.

However, our prior caselaw does not support the proposition that all acts not expressly permitted by the TSL are prohibited. Indeed, our earlier decision in *Dvorkin, supra,* cited in *Brewer, supra,* 53 *N.J.* at 173, 249 *A.*2d 388, explicitly recognized that the statutory scheme permitted municipalities some latitude in imple-

menting its purposes, so long as the municipality did not "interpolate or add material conditions in contravention of the legislative grant." *Dvorkin, supra,* 29 *N.J.* at 319, 148 *A.*2d 793.

■ Our duty is to construe the TSL, and specifically its grant of authority to municipalities in respect of the bulk sale of TSCs. As a general matter, we construe broadly municipal powers delegated by the Legislature, consistent with the constitutional directive to do so. *N.J. Const.* art. IV, § 7, ¶ 11. *See Fanelli v. City of Trenton,* 135 *N.J.* 582, 591, 641 *A.*2d 541 (1994); *see also Holmdel Builders Ass'n v. Township of Holmdel,* 121 *N.J.* 550, 566, 583 *A.*2d 277 (1990) (stating "[t]he authority delegated to [municipalities] ... is to be construed liberally in their favor"); *Inganamort v. Borough of Fort Lee,* 62 *N.J.* 521, 533, 303 *A.*2d 298 (1973); *Fred v. Mayor of Borough of Old Tappan,* 10 *N.J.* 515, 518, 92 *A.*2d 473 (1952). Express powers as well as those that arise by fair implication are given broad latitude, so long as they are not wielded in contravention of the overarching statutory grant of authority or conflict otherwise with an express statutory limitation or prohibition. *See D.L. Real Estate Holdings, L.L.C. v. Point Pleasant Beach Planning Bd.,* 176 *N.J.* 126, 132, 820 *A.*2d 1220 (2003); *Palisades Props., Inc. v. Brunetti,* 44 *N.J.* 117, 133, 207 *A.*2d 522 (1965). *See also McCurrie v. Town of Kearny,* 174 *N.J.* 523, 531, 809 *A.*2d 789 (2002). We adhere to that principle in this matter.

### B.

Jersey City's Tax Lien Financing plan created a way for Jersey City to maximize its collection of delinquent property taxes. Jersey City received a large lump sum of cash and a note bearing a high rate of interest. In exchange, Jersey City permitted, indeed encouraged, the private investors to implement the IPPs. The IPPs benefited Jersey City and its property owners in that they offered a payment plan to property owners who were unable to pay the full redemption amount and who otherwise would have lost their properties in foreclosure proceedings. Having conclud-

ed that Jersey City was not precluded expressly or impliedly by the TSL from authorizing the bulk purchasers of the TSCs to enter into IPPs with delinquent property owners, we turn now to examine the specifics of the form of IPP used.

The trial court found the following aspects of the IPPs to have violated the TSL's requirements and limitations: (1) exacting compound interest on an amount other than the face amount of the certificate of assignment; (2) calculating *per diem* interest based on an assumed 360–day year and multiplying that *per diem* rate by 365 days to calculate interest payments for the actual year; (3) charging redemption fees (i) in advance of redemption, (ii) with respect to payments not made to the municipal tax collector, and (iii) without filing affidavits with the tax collector; and (4) charging fees not authorized by statute, including but not limited to bad-check fees. We address these in turn.

Plaintiffs assert that the exacting of compound interest violates the TSL. *N.J.S.A.* 54:5–60 provides that "the amount required for redemption shall include all sums for subsequent taxes, municipal liens and charges, and interest and costs thereon, *actually paid by the holder of the tax title* ... together with interest on the amount so paid." (Emphasis added). Thus, *N.J.S.A.* 54:5–60 permits the TSC holder to recover all out-of-pocket expenses, to the extent permitted by the TSL, in connection with obtaining the TSC.[2] The actual amount paid, or "the assignment amount," constitutes the basis for the calculation of interest. *See N.J.S.A.* 54:5–65, – 68, –71.

As the parties appear to have realized, the initial methodology used by Bankers Trust to compute interest was inconsistent with *N.J.S.A.* 54:5–60. Bankers Trust compounded interest based on the total of "the assignment amount" and the interest that had accrued. We regard this issue as essentially moot, however, because the record indicates that prior to the commencement of

[2] See discussion *infra* on whether TSC holders may exact the statutory fees prior to redemption.

the lawsuit Bankers Trust altered its method of compounding interest to comply with the statute in respect of assignment amount and credited overpayments to the property owners' accounts. To the extent that there may remain any factual questions about credits due, we rely on the trial court to sort through such claims on remand. Plaintiffs also contend that Bankers Trust's assumption of a 360–day year to compute a *per diem* interest charge, and the application of that daily interest rate for 365 days, conflicted with the TSL. That methodology effectively resulted in an actual annual rate of 18.25% paid by the taxpayer.

■ *N.J.S.A.* 54:5–32 provides that the interest rate applied to a TSC may not exceed 18% per annum. The statutory provision is plain on its face concerning the interest rate that may be exacted, but fails to address what financial assumptions a municipality may apply when calculating the interest payment due. Indeed, the TSL does not contain any indication as to what financial assumptions a municipality may use in order to maintain consistency in the collection of interest and delinquent taxes (*i.e.* for consistency in leap years). In our view, the financial assumption adopted by Bankers Trust reasonably ensures consistency in the collection of taxes: every month has 30 days and there are twelve months in a year, which results in a 360–day year. Furthermore, we note that the methodology of using a 360–day year to calculate a *per diem* interest rate that is spread over 365 days is consistent with that employed by Jersey City in its own accounting, and disclosed as per the requirements of the Generally Accepted Accounting Principles (GAAP), which municipalities are bound to follow. *See* *N.J.A.C.* 5:31–7.1 (requiring all municipalities to follow GAAP). *But see Silverstein v. Shadow Lawn Savings & Loan,* 51 *N.J.* 30, 41–43, 237 *A.*2d 474 (stating that absent statutory or contractual language disclosing same, party may not employ 365/360 method of computing interest). We conclude that even though the 360–day year assumption effectively results in the taxpayer paying an annual rate of 18.25%, the assumption is permissible and consis-

tent with the methodology that apparently would be used in IPPs issued by Jersey City itself.

■ The plaintiffs further contend that the defendants collected statutory fees in advance of redemption, collected fees that normally are collected by the municipal tax collector, and collected fees without filing affidavits with the collecting official. *N.J.S.A.* 54:5–62 provides in relevant part that

> No such fees or expenses incurred pursuant to R.S.54:5–61, shall be collectible, unless such redemption is made by payment to the collecting officer and unless the holder of the tax title shall have made and filed with such collecting officer affidavits showing the amount or amounts of such expenses actually disbursed or incurred, affidavits of service, including copies of the notices served, and certificates of the searches made in the form of an abstract of title covering a period of not less than twenty years.

*N.J.S.A.* 54:5–61, which is referenced in subsection 62, details the statutory fees that a TSC holder may redeem from the delinquent property owner.

To the extent that the Appellate Division regarded the IPPs as purely private in nature and eschewed review of specific contract provisions that are inconsistent with statutory procedures, we must modify its judgment. We have concluded that Jersey City had the authority to permit the bulk purchaser and holder of its TSCs to enter into IPPs with related taxpayers in the same manner as would the municipality. We do not conclude that the statutory procedures for recording payments and establishing permitted expenses may be disregarded. Those issues must be remanded to the trial court for review and, if necessary, reformation of the IPPs. In that respect, we anticipate that the trial court and the parties will look to *N.J.S.A.* 52:27BBB–66 to –79 for guidance on how to reconcile the statutory procedures of Title 54 with the IPPs issued by a private party. In particular, subsections j., l., m., and n. of *N.J.S.A.* 52:27BBB–70 may be of assistance in that review.

Plaintiffs also complain that the private investors collected fees not expressly authorized by the TSL. Specifically, plaintiffs contend that Bankers Trust charged an impermissible twenty-five

dollar fee for dishonored checks. However, we are informed that the practice of assessing a fee for dishonored checks was discontinued prior to the filing of plaintiffs' lawsuit, apparently because Bankers Trust ceased accepting personal checks. To the extent the assessment of a "bad-check fee" remains in issue, we direct the trial court to examine whether Bankers Trust was simply passing along the cost to it of a dishonored check. As such, we do not deem that to be an impermissible expense to collect from the taxpayer as part of redemption. The trial court also may seek to determine whether such expenses are passed along under the terms of municipal IPPs. That said, we add, for the benefit of the trial court, that we regard minor technical deviations as permissible so long as the intent and purpose of the TSL are not violated.

Plaintiffs' remaining arguments about the IPPs resulting in partial redemption appear to be unnecessary to our disposition. Because of our determination that the IPPs must be reconciled with the statutory scheme, the filing and recording requirements that will apply as between Bankers Trust, or its agent, and the municipal tax collector will eliminate any question concerning the collector's obligation to recognize and credit installment payments made by the property owner to the defendants. *See, e.g., N.J.S.A.* 52:27BBB–701 (requiring communication between tax collector and IPP issuing corporation with regard to redemption of TSC). As a result, a property owner who desires to redeem with the municipal tax collector should not be required to overpay to achieve redemption.[3]

■■■ The final issue posed by the plaintiffs is whether private investors, through the IPP contract, can convert an *in rem* debt

---

[3] We note expressly that this appeal does not present the situation where the property owner made a partial payment in an attempt to redeem the property, *see Township of Millburn v. Block 1208,* 189 *N.J.Super.* 523, 529–30, 461 A.2d 163 (Ch.1983), or the situation where the property owner attempted to redeem only a portion of the property. *Lonsk v. Pennefather,* 168 *N.J.Super.* 178, 182–83, 402 A.2d 259 (App.Div.1979). In both of those other situations, the property owners were attempting to make a "partial redemption" in the sense that they were attempting to recover the property by only making a partial payment.

into a personal debt. *N.J.S.A.* 54:5–104.33 specifically proscribes any party acting pursuant to the TSL to seek a personal judgment. *See also City of Newark v. Central and Lafayette Realty Co., Inc.,* 150 *N.J.Super.* 18, 21, 374 *A.*2d 504 (App.Div.), *certif. denied,* 75 *N.J.* 528, 384 *A.*2d 508 (1977). The record is unclear whether the defendants ever pursued personal liability against any property owner for failure to comply with the IPP. What little can be gleaned from the record is that the TSC holders instituted foreclosure proceedings as their only method of redress for non-payment. Based on our decision today, the powers delegated to private investors may not be inconsistent with the limits imposed on a municipality issuing an IPP. On remand, if the issue is pressed, the trial court will conduct an inquiry into whether the defendants held any property owners personally liable for defaulting on IPPs and to make adjustment accordingly.

## C.

Having held that it was permissible for Jersey City to have authorized defendants to issue IPPs as part of the bulk sale of its TSCs, we find no *per se* violation of the New Jersey Consumer Fraud Act. The plaintiffs claimed a CFA violation based on the IPPs' irregular compliance with Title 54. Notwithstanding the adjustments that may be necessary to bring these transactions into compliance with the requirements of Title 54 as described in this opinion, we find no evidence of the type of unconscionable commercial practice violative of the CFA.

## VI.

The judgment of the Appellate Division is affirmed, as modified, and the matter is remanded to the trial court for further proceedings consistent with this opinion.

*For Affirmance as Modified/Remandment*—Chief Justice PORITZ and Justices VERNIERO, LaVECCHIA, ALBIN and WALLACE—5.

*Opposed*—None.